**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| GLOCK, INC.,<br><br>Plaintiff,<br><br>v.<br><br>PATRICK J. GRIFFIN, in his official capacity as Chief State's Attorney, et al.,<br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Civil Action No.: 3:26-cv-01525<br><br><br><br>SEPTEMBER 21, 2026 |

# GLOCK, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS


SUMMARY OF THE ARGUMENT ..... 1

BACKGROUND ..... 3

A. Development of the "Triple Block" Design. ..... 7

B. HB 5043's Impact on Law Enforcement. ..... 8

C. Details of HB 5043's Prohibitions. ..... 9

D. Plaintiff's Efforts to Engage With Defendants. ..... 10

ARGUMENT ..... 12

I. Glock, Inc.'s Challenge To The Convertible Pistol Ban Is Likely To Succeed On The Merits. ..... 13

A. The "Convertible Pistol" Ban Restricts Conduct Protected by the Second Amendment. ..... 13

B. There Is No Historical Tradition of Banning Arms in Common Use on the Basis that Criminals May Seek to Modify Them. ..... 16

II. Connecticut's "Convertible Pistol" Ban Impermissibly Infringes on Glock, Inc.'s Right to Free Speech. ..... 20

A. The First Amendment Protects Glock, Inc.'s Speech. ..... 20

B. Connecticut's "Convertible Pistol" Ban Is an Impermissible Content- and Viewpoint-Based Restriction on Speech. ..... 21

III. The Remaining Injunction Factors Overwhelmingly Support Enjoining The Convertible Pistol Ban. ..... 24

A. Enforcement of the "Convertible Pistol" Ban Will Cause Irreparable Harm. ..... 24

B. The Equities and Public Interest Demonstrate the Need for Emergency Injunctive Relief. ..... 26

CONCLUSION ..... 28

**TABLE OF AUTHORITIES**

*44 Liquormart, Inc. v. Rhode Island*,
517 U.S. 484 (1996) ........ 23

*American Civil Liberties Union v. Ashcroft*,
322 F.3d 240 (3d Cir. 2003) ........ 24

*Association of New Jersey Rifle and Pistol Clubs, Inc. v. Attorney General New Jersey*,
183 F.4th 211 (3d Cir. 2026) ........ *passim*

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023) ........ 24

*Bianchi v. Brown*,
111 F.4th 438 (4th Cir. 2024) ........ 15

*Book People, Incorporated v. Wong*,
91 F.4th 318 (5th Cir. 2024) ........ 27

*Brown v. Entertainment Merchants Assn.*,
564 U.S. 786 (2011) ........ 22

*Brown v. Yost*,
133 F.4th 725 (6th Cir. 2025) ........ 26

*Caetano v. Massachusetts*,
577 U.S. 411 (2016) ........ 18

*Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*,
447 U.S. 557 (1980) ........ 20, 23

*Chiles v. Salazar*,
607 U.S. 627 (2026) ........ 22

*Christian v. James*,
176 F.4th 189 (2d Cir. 2026) ........ 25

*Council for Responsible Nutrition v. James*,
159 F.4th 155 (2d Cir. 2025) ........ 26

*Cumulus Media New Holdings Inc. v. Nielsen Company (US), LLC*,
182 F.4th 108 (2d Cir. 2026) ........ 24

*Defense Distributed v. United States Department of State*,
838 F.3d 451 (5th Cir. 2016) ........ 24

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ........ *passim*

*DoorDash, Inc. v. City of New York*,
185 F.4th 1 (2d Cir. 2026) ........ 23

*Drummond v. Robinson Township*,
9 F.4th 217 (3d Cir. 2021) ........ 14

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ........ 24

*Gazzola v. Hochul*,
88 F.4th 186 (2d Cir. 2023) ........ 15

*Grand River Enterprise Six Nations, Ltd. v. Pryor*,
481 F.3d 60 (2d Cir. 2007) ........ 26

*Grant v. Higgins*,
___ S.Ct. ___, 2026 WL 1871312 (U.S. June 30, 2026) ........ 17

*Heller v. District of Columbia*,
670 F.3d 1244 (D.C. Cir. 2011) ........ 15

*Junior Sports Magazines Inc. v. Bonta*,
80 F.4th 1109 (9th Cir. 2023) ........ 21

*Luis v. U.S.*,
578 U.S. 5 (2016) ........ 14

*National Association for Gun Rights v. Lamont*,
153 F.4th 213 (2d Cir. 2025) ........ 15, 17

*National Shooting Sports Foundation v. Attorney General New Jersey*,
___ F.4th ___, 2026 WL 2639295 (3d Cir. Sept. 8, 2026) ........ 27

*New York Progress and Protection PAC v. Walsh*,
733 F.3d 483 (2d Cir. 2013) ........ 26

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
597 U.S. 1 (2022) ........ *passim*

*Nken v. Holder*,
556 U.S. 418 (2009) ........ 26

*Nordyke v. Santa Clara*,
110 F.3d 707 (9th Cir. 2009) 21

*North American Soccer League, LLC v. United States Soccer Federation, Inc.*,
883 F.3d 32 (2d Cir. 2018) 12

*Ortega v. Grisham*,
148 F.4th 1134 (10th Cir. 2025) 24, 26

*Otto v. City of Boca Raton, Florida*,
981 F.3d 854 (11th Cir. 2020) 27

*Packingham v. North Carolina*,
582 U.S. 98 (2017) 22

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015).

*Reese v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*,
127 F.4th 583 (5th Cir. 2025) 14

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004) 26

*Reuters Ltd. v. United Press Intern., Inc.*,
903 F.2d 904 (2d Cir. 1990) 26

*Rigby v. Jennings*,
___ F. Supp. 3d___, 2026 WL 2664371 (D. Del. Sept. 10, 2026) 13, 24, 27

*Schrader v. District Attorney of York County*,
74 F.4th 120 (3d Cir. 2023) 27

*Snope v. Brown*,
605 U.S. ___, 145 S.Ct. 1534 (June 2, 2025) 18

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) 23

*Staples v. U.S.*,
511 U.S. 600 (1994) 6

*Teixeira v. County of Alameda*,
873 F.3d 670 (9th Cir. 2017) 14

*Thompson v. W. States Med. Ctr.*,
535 U.S. 357 (2002) 23

*United States v. Rahimi*,
602 U.S. 680 (2024) ..... 13

*U.S. v. Caronia*,
703 F.3d 149 (2d Cir. 2012) ..... 23

*W. Va. State Bd. of Educ. v. Barnette*,
319 U.S. 624 (1943) ..... 20

*Wolford v. Lopez*,
609 U.S. ___, 146 S.Ct. 2032 (June 25, 2026) ..... 13, 14, 16

*Wrenn v. District of Columbia*,
864 F.3d 650 (D.C. Cir. 2017) ..... 24

## SUMMARY OF THE ARGUMENT

Glock, Inc. respectfully moves for the entry of a temporary restraining order and preliminary injunction barring Defendants from enforcing Connecticut's ban on "convertible pistols" enacted pursuant to Substitute House Bill No. 5043, Public Law 26-14 ("HB 5043"), pending a decision on its request for a declaratory judgment that the pistols that it currently sells to the commercial market do not fall within the definition of "convertible pistols" for purposes of Conn. Gen. Stat. § 53-202(a)(4) or, in the alternative, that the ban on "convertible pistols" is unconstitutional.

GLOCK pistols are the most popular handguns both in the United States and in Connecticut, for both civilians and law enforcement. This popularity is because of the Safe Action® System, which involves the use of a cruciform trigger bar and makes GLOCK pistols safe, reliable, and easy to use.

All semiautomatic firearms can be converted to fire fully automatic by someone with the required knowledge and skill, and access to necessary tools and machinery, particularly if existing parts can be replaced with new parts designed and intended to facilitate conversion from semiautomatic to fully automatic. See **Exhibit A**, Declaration of Derek Watkins ("Watkins Decl.") ¶ 11.

Because GLOCK pistols are by far the single most popular model of semiautomatic pistol, they also became among the most popular model of pistol to illegally convert using a machinegun conversion device ("MCD"), which is defined as a "pistol converter" under HB 5043. When the use of MCDs to illegally convert GLOCK pistols to machineguns began to increase, Glock Ges.m.b.H. and Glock Technology GmbH, the Austrian companies that design and develop GLOCK pistols, began to investigate ways in which the design could be changed to address MCDs without adversely affecting the Safe Action System. A "triple block" was subsequently developed,

which prevents the installation of all known MCDs into GLOCK pistols. Glock, Inc. subsequently discontinued the manufacture, importation and sale of new Gen5 and earlier model pistols, except for the Slimline pistols,[1] to the civilian market and replaced them with pistols that incorporate the "triple block" design.

Effective October 1, 2026, Connecticut makes it a felony to import, advertise, sell, or offer or expose for sale "convertible pistols," which can be generally defined as pistols manufactured on or after October 1, 2026 that have a cruciform trigger bar and are capable of being readily converted into a machinegun through the installation of an MCD. Glock, Inc. maintains that all new GLOCK pistols that it currently sells to the civilian market do not fall within the definition of "convertible pistols" and are therefore not subject to the ban. Due to the vague and confusing language used in the ban on "convertible pistols," however, Glock, Inc. sought confirmation from the State, including, but not limited to, Defendant Patrick J. Griffin, in his official capacity as Chief State's Attorney, that it agrees with its conclusion. Glock, Inc. has not received a response from the State.

Because of the rapidly approaching effective date of the ban on "convertible pistols," and the unsettled question of whether the ban applies to the GLOCK pistols currently sold to consumers in Connecticut, Glock, Inc. seeks the entry of a temporary restraining order and preliminary injunction against enforcement of the ban on "convertible pistols" as applied to the GLOCK pistols currently sold to consumers in Connecticut. Although the definition of a "convertible pistol" is limited to those manufactured on or after October 1, 2026, there is no way for a firearms dealer in Connecticut or a consumer seeking to purchase a GLOCK pistol in Connecticut to independently identify the date on which it was manufactured. Due to the felony penalties for violations of the

[1] The Slimline GLOCK pistols have not been susceptible to the installation of MCDs. *Infra*, n.2.

ban on "convertible pistols," and the lack of clarity regarding whether the GLOCK pistols currently sold to consumers in Connecticut are excluded from the ban, the ability of consumers in Connecticut to purchase the most popular pistol in common use by law-abiding citizens for lawful purposes will be infringed effective October 1, 2026. This restriction violates the right to keep and bear arms protected by the Second Amendment and constitutes irreparable injury. In addition, Glock, Inc. will lose revenue from the sales of pistols to consumers in Connecticut. Because sovereign immunity prevents Glock, Inc. from recovering monetary damages from Connecticut, this also constitutes irreparable injury.

## BACKGROUND

Gaston Glock invented and developed the Pistole 80 ("P80") for the Austrian Ministry of Defense between 1980 and 1982. The Austrian Armed Forces adopted the GLOCK P80 pistol, which incorporates the Safe Action System, in 1982. When Norway commissioned Glock Ges.m.b.H. to supply its armed forces with P80 pistols in 1984, a renaming of the pistol took place and the P80 became known as the GLOCK 17.

The Safe Action System was a revolutionary design that provides a consistent trigger pull from the first to the last round. It features an automatic safety system consisting of three passive, independently operating, mechanical safeties that are built into the fire control system of the pistol. This safe, simple, and fast system allows the user to fully concentrate on shooting without having any additional actions to disengage and reengage safeties and renders the pistol safe if it is dropped. All three safeties disengage sequentially as the trigger is pulled and automatically re-engage when the trigger is released:




The trigger safety is the first safety in the firing sequence. It is incorporated into the trigger in the form of a lever and when it is engaged, blocks the trigger from moving rearward. To fire the pistol, the trigger safety and the trigger itself must be deliberately depressed at the same time. If the trigger safety is not depressed, the trigger will not move rearwards and allow the pistol to fire. The trigger safety is designed to prevent the pistol from firing if it is dropped, or if the trigger is subjected to any pressure that is not a direct pull.

The second safety, the firing pin safety, mechanically blocks the firing pin from moving forward in the ready-to-fire condition. As the trigger is pulled rearward, the trigger bar pushes the firing pin safety up and frees the firing pin channel. If the user decides not to fire and releases the trigger, the firing pin safety automatically reengages.

The final safety involves the cruciform trigger bar, which rests on the safety ramp within the trigger mechanism housing. The cruciform trigger bar engages the rear portion of the firing pin and prevents the firing pin from moving forward. As the trigger is pulled rearward the cruciform trigger bar lowers down the safety ramp and allows the release of the firing pin. After firing, the cruciform trigger bar moves upward and re-engages the firing pin. As the trigger is released, all safeties automatically reengage.




Gaston Glock understood that reliability resides in simplicity, and therefore, he designed the Model 17 pistol with as few parts as possible, minimizing its complexity. GLOCK pistols are made from an average of only thirty-four parts, which is significantly fewer than any other pistol on the market that is not based on the GLOCK pistol design, and makes it more durable, reliable, and easier to maintain than other pistol designs. Because of the superior design of GLOCK pistols, they quickly became the most popular pistols in the United States and are currently used by more than 65% of law enforcement agencies in the United States, including a substantial majority of federal law enforcement agencies.

GLOCK pistols are particularly favored by law enforcement in Connecticut, where approximately 85% of law enforcement agencies issue GLOCK pistols to their officers, including (among others) the Connecticut State Police, Connecticut Division of Criminal Justice, Danbury Police Department, Greenwich Police Department, Hartford Police Department, New Britain Police Department, New Haven Police Department, Norwalk Police Department, and West Hartford Police Department. In addition to the law enforcement agencies that issue GLOCK pistols to their officers, numerous law enforcement officers work for agencies that authorize them

to purchase their own GLOCK pistols for use on duty. GLOCK pistols also became by far the most popular handgun for civilian consumers, with more GLOCK pistols having been sold than any other handgun made. Glock, Inc. sells hundreds of thousands of GLOCK pistols every year.

As the U.S. Supreme Court has noted, "virtually any semiautomatic weapon may be converted, either by internal modification or, in some cases, simply by wear and tear, into a machinegun[.]" *Staples v. U.S.*, 511 U.S. 600, 615 (1994); *see also id.* at 612 n.6 (noting that "readily convertible semiautomatics" have never been banned). Like other semiautomatic firearms, certain GLOCK pistols can be illegally converted to a fully automatic machinegun through the installation of an MCD. Watkins Decl. ¶¶ 11, 13-16.

A Venezuelan individual entirely unrelated to Glock sought to patent an MCD that he designed for use in GLOCK pistols in the 1990s. That third-party's MCD design replaces the cover plate of the standard width GLOCK pistols,[2] and it was publicly disclosed by the U.S. Patent and Trademark Office ("USPTO") in a U.S. patent application in 1996. The USPTO issued a patent on that MCD design in 1998. The 1996 patent application and the 1998 patent have and continue to be publicly available in the USTPO's public patent database.

Beginning in 2020, MCDs based on this design became increasingly popular, with the majority of them being illegally imported from China, or made using 3D printers. MCDs are banned as machineguns pursuant to both federal law (18 U.S.C. §§ 921(24) & 922(0), 26 U.S.C. § 5845(b) (defining a machinegun as including "any part designed and intended solely and

[2] Due to differences in the design from the standard width GLOCK pistols, the later developed Slimline series of GLOCK pistols (Models 42, 43, 43X, and 48) are not susceptible to the installation of an MCD. Slimline GLOCK pistols have materially different rear-frame and slide geometry from the standard frame width GLOCK pistols and their narrower configuration, including the reduced spacing between the rear frame rails, and the different slide cover plate dimensions, prevents all known MCDs from being installed on them. Watkins Decl. ¶¶ 17-18.

exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun")) and Connecticut law (Conn. Gen. Stat. § 53-202(a)(1)(B) (defining a machinegun as including "any part or combination of parts designed for use in converting a weapon into a machine gun")).

### A. Development of the "Triple Block" Design.

In response to the increasing popularity of MCDs, beginning in 2022, Glock Ges.m.b.H. and Glock Technology GmbH, the Austrian companies responsible for the design and development of GLOCK pistols, began investigating potential ways in which the design of the standard frame width GLOCK pistols could be modified to inhibit the installation of an MCD, without adversely affecting the safety, reliability and durability inherent in the cruciform trigger bar design and the Safe Action System. Those Austrian companies eventually developed a "triple block" design that included changes to both the frame and slide designed to inhibit the installation of an MCD. The "triple block" consists of: (1) rear frame rails that are reinforced with a hardened steel bracket; (2) steel domes in the slides that protrude into the space where the leg of an MCD could interact with the cruciform trigger bar; and (3) a modified slide cover plate design. Watkins Decl. ¶ 19. The "triple block" was incorporated into certain popular Gen5 GLOCK pistols (the Model 17, 19, 19X, 20, 21, 23, 26, 44, and 45), which were then designated as V Series versions of those pistol models. *Id*. ¶ 20. The same "triple block" used in the V Series was incorporated into the most recent Gen6 GLOCK pistols. *Id*. The hardened steel bracket that is one of the components of the "triple block" in the V Series and Gen6 versions of the GLOCK pistols cannot be readily removed from the pistol's frame. *Id*. ¶ 33 (applying the standard for serial numbers that are not considered to be "readily removed" for purposes of 27 C.F.R. § 478.92(a) to the undefined term "readily removed" as used in Conn. Gen. Stat. § 53-202(a)(4)(B)).

The "triple block" in the V Series and Gen6 GLOCK pistols shields the trigger bar from an MCD from being installed on them, Watkins Decl. ¶ 21, and the hardened steel bracket that is one of the components of the "triple block" is molded into the pistol's frame. *Id.* ¶ 22. This hardened steel bracket shields the cruciform trigger bar in the V Series and Gen6 GLOCK pistols from interference by an MCD and constitutes a "tab or other piece of material," as such term is used in Conn. Gen. Stat. § 53-202(a)(4)(B). *Id.* ¶¶ 23-24.

Glock, Inc. submitted an exemplar Model 19 Gen6 GLOCK pistol to the Bureau of Alcohol Tobacco, Firearms, and Explosives ("ATF") Firearms Technology Industry Services Branch ("FTISB"), which tested it and compared it against a Model 19 Gen5 GLOCK pistol to determine whether the "triple block" would prevent the installation of known MCDs. In a report dated July 8, 2025, Rondal Bleigh, Acting Chief of the ATF's FTISB concluded that the "triple block" incorporated into the V Series and Gen6 GLOCK pistols prevented the installation and function of all tested MCDs. Watkins Decl. ¶¶ 25-26.[3] The report specifically noted that the internal hardened steel bracket is encased in the polymer frame, has been extended to prevent an MCD from being installed, and is not easily modified or altered. *Id.* ¶¶ 25-26. Since December 1, 2025, with the exception of Slimline pistols, Glock, Inc. discontinued the manufacture, importation and sale of new Gen5 and earlier model pistols to the civilian market and replaced them with V Series and Gen6 pistol models.

**B. HB 5043's Impact on Law Enforcement.**

Glock, Inc. still manufactures and/or imports certain Gen3, Gen4, and Gen5 pistol models, but they are sold exclusively to law enforcement, government agencies and for export, not to the

[3] *See also* Watkins Decl. ¶ 27 (The "triple block" in the Model 19 Gen6 GLOCK Pistol that was the subject of the July 8, 2025 report from the ATF FTISB is the same as the "triple block" installed in all V Series and Gen6 GLOCK pistols, so the conclusions of that report apply equally to them.).

U.S. civilian market. Significantly, however, the State's "convertible pistol" ban does not contain an exception for law enforcement. After October 1, 2026 all state and local law enforcement agencies in Connecticut and their sworn personnel will be impacted by the statute's prohibitions. This is despite the fact that approximately 85% of Connecticut police departments, including the Connecticut State Police, issue GLOCK pistols to their sworn personnel and rely on them every day to protect themselves and the public at large.

Most law enforcement agencies that issue GLOCK pistols have only authorized the use of Gen5 (and earlier) pistol models. When a law enforcement agency needs a warranty replacement or seeks to acquire new pistols from its approved model list, the "convertible pistol" ban will prohibit law enforcement in Connecticut from acquiring any Gen5 and earlier pistol models that are manufactured on or after October 1, 2026.

### C. Details of HB 5043's Prohibitions.

Before 2026, no semiautomatic firearms have been banned simply because they are capable of being illegally converted to a machinegun through the installation of an MCD. HB 5043 was enacted into law on May 26, 2026, and goes into effect on October 1, 2026. It enacts a new definition of a "convertible pistol" in Connecticut law. A "convertible pistol" is defined as "any semiautomatic pistol with a cruciform trigger bar that can be readily altered by hand or with a common household tool so that the pistol can be readily converted into a machine gun by the installation or attachment of a pistol converter[.]" Conn. Gen. Stat. § 53-202(a)(4). A "cruciform trigger bar" is defined as a "component in a semiautomatic pistol that serves as a linkage between the trigger and firing pin and has its sear incorporated in a cross-shaped surface." Conn. Gen. Stat. § 53-206g(c)(5). A "common household tool" is defined as including a "knife, screwdriver, wrench, hacksaw, crowbar, electric drill, rotary tool, hammer, chisel, file or pliers." Conn. Gen. Stat. § 53-206g(c)(6).

A "pistol converter" is defined as "any device or instrument that, when installed in or attached to the rear of the slide of a semiautomatic pistol, interferes with the trigger mechanism, thereby enabling the pistol to discharge a number of shots or bullets rapidly or automatically with one continuous pull of the trigger." Conn. Gen. Stat. § 53-206g(c)(3). The terms "readily altered" and "readily converted" as used in Section 53-202(a)(4) are not defined. Watkins Decl. ¶ 8. There is an exception excluding from the definition of a "convertible pistol" "any semiautomatic pistol with a cruciform trigger bar that has a tab or other piece of material molded to the pistol's frame that shields the cruciform trigger bar from interference by a pistol converter, unless the tab or other piece of material can be readily removed from the pistol's frame." Conn. Gen. Stat. § 53-202(a)(4)(B). The term "readily removed," as used in Section 53-202(a)(4)(B), is not defined. Watkins Decl. ¶ 10.

HB 5043 provides that any "individual or firm, partnership, corporation, limited liability company, association or other similar entity that knowingly imports into this state or knowingly advertises, sells, offers or exposes for sale any convertible pistol, as defined in section 53-202 of the general statutes, as amended by this act, that was manufactured on or after October 1, 2026, shall be guilty of a class D felony." Public Law 26-41 § 3.[4] A class D felony is punishable by up to five years imprisonment and a fine of up to $5,000. Conn. Gen. Stat. §§ 53a-35a(8), 53a-41(4).

**D. Plaintiff's Efforts to Engage With Defendants.**

Counsel for Glock, Inc. wrote to the Connecticut Office of the Attorney General on July 3, 2026, to discuss HB 5043 and seek confirmation that the Slimline, V Series, and Gen6 GLOCK pistols do not fall within the definition of a "convertible pistol" pursuant to Conn. Gen. Stat. § 53-202(a)(4). Outside counsel for Glock, Inc. and representatives of Glock, Inc. met with seven

[4] This provision has not yet been codified in the Connecticut General Statutes.

representatives of the Connecticut Office of the Attorney General, and two representatives of the Connecticut State Police Special Licensing and Firearms Unit ("SLFU"), on August 27, 2026. During this meeting, they explained why the Slimline, V Series, and Gen6 GLOCK pistols do not fall within the definition of a "convertible pistol" using exemplars of the above models and a Gen5 GLOCK pistol, as demonstratives. Representatives from the Connecticut State Police SLFU advised during this August 27 meeting that federally licensed firearms dealers in Connecticut have been calling to ask whether the importation and sale of new GLOCK pistols will be banned effective October 1, 2026, but that they do not know the answer.

At the conclusion of the August 27, 2026 meeting, Glock, Inc. requested the State's position regarding whether the Slimline, V Series, and Gen6 GLOCK pistols are considered to be "convertible pistols," as defined by Conn. Gen. Stat. § 53-202(a)(4), such that the importation, advertisement, and sale of newly manufactured pistols of such models will be banned effective October 1, 2026. The representatives of the Connecticut Office of the Attorney General refused to respond and advised that criminal law enforcement "is simply not a part of . . . the duties of [the] [O]ffice [of Attorney General]." Further, the Office of Attorney General stated that it "cannot answer legal questions from private parties pursuant to our legal authority" and advised that such issue should be addressed to the Chief State's Attorney's Office.

Glock, Inc. sent a letter addressed to the Chief State's Attorney on September 8, 2026, requesting the State's position regarding whether the Slimline, V Series, and Gen6 GLOCK pistols are considered to be "convertible pistols," as defined by Conn. Gen. Stat. § 53-202(a)(4). Because of the October 1, 2026 effective date of the ban, Glock, Inc. requested a response to its September 8, 2026 letter by September 14, 2026. This letter was copied to all Defendants named in this

Complaint, as well as certain representatives of the Connecticut Office of the Attorney General and Connecticut State Police SLFU that attended the August 27, 2026 meeting.

As of the filing of this Motion, the Office of the Connecticut Chief State's Attorney has not advised whether the State considers the Slimline, V Series, and Gen6 GLOCK pistols to fall within the definition of a "convertible pistol" pursuant to Conn. Gen. Stat. § 53-202(a)(4) such that the importation, advertisement, and sale of such pistols manufactured on or after October 1, 2026 will be banned. Without written confirmation that the Slimline, V Series, and Gen6 GLOCK pistols do not fall within the definition of a "convertible pistol" pursuant to Conn. Gen. Stat. § 53-202(a)(4), the Connecticut firearms dealers who participate in the Glock Stocking Dealer program and have contractual agreements with Glock, Inc. to purchase GLOCK pistols for re-sale to consumers, as well as all other federal firearm licensees in Connecticut, will be unlikely to continue purchasing any GLOCK pistols after October 1, 2026 because of the substantial criminal penalties associated with a potential violation. In addition, Glock, Inc. will lose revenue from the ban on sales of GLOCK pistols to consumers in Connecticut.

## ARGUMENT

Rule 65 of the Federal Rules of Civil Procedure authorizes district courts to issue preliminary injunctions and temporary restraining orders to "maintain the status quo pending resolution of the case." *N. Am. Soccer League v. U.S. Soccer Fed'n*, 883 F.3d 32, 36 (2d Cir. 2018). To justify injunctive relief, a plaintiff must establish either: (1) a "likelihood of success on the merits"; or (2) "both serious questions on the merits and a balance of hardships decidedly favoring the moving party." *Id.* at 37. In addition, a plaintiff must also show irreparable harm if an injunction is not entered, and that an injunction is in the public interest. *Id.* These factors all favor a temporary restraining order and preliminary injunction barring enforcement of the "convertible pistol" ban as applied to the Slimline, V Series, and Gen6 GLOCK pistols.

## I. Glock, Inc.'s Challenge To The Convertible Pistol Ban Is Likely To Succeed On The Merits.

### A. The "Convertible Pistol" Ban Restricts Conduct Protected by the Second Amendment.

In *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 19 (2022), the Supreme Court clarified that courts must approach Second Amendment cases under a two-step framework. *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey ("ANJRPC 2026")*, 183 F.4th 211, 229 (3d Cir. 2026) (en banc) (finding that so-called "assault rifles" and "large capacity magazines" are protected by the Second Amendment). The first question in a case challenging a law on the basis that it violates the Second Amendment is whether the law implicates the right to keep and bear arms. *Wolford v. Lopez*, 609 U.S. __, 146 S. Ct. 2032, 2043 (2026). "If the answer is yes, then 'the Constitution presumptively protects that conduct,' and the government cannot 'justify its regulation' by 'simply posit[ing] that the regulation promotes an important interest.'" *ANJRPC 2026*, 183 F.4th at 229 (quoting *Bruen*, 597 U.S. at 17). Consequently, when the challenged law "regulates arms-bearing conduct" in any respect, *United States v. Rahimi*, 602 U.S. 680, 691 (2024), it implicates the Second Amendment, and the government bears the burden to prove that such law is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

Under the first-step of a Second Amendment analysis, Courts are called to inquire into:

> three subsidiary questions: (1) does the law apply to "all members of the political community," (2) does the law "concern any form of 'Arms,' *i.e.*, any weapon customarily used for offensive or defensive purposes," and (3) "does the law place any restrictions on either the 'keep[ing]' (*i.e.*, possession) or the "bear[ing]' (*i.e.*, carrying) of arms?"

*Rigby v. Jennings*, __ F. Supp. 3d __, 2026 WL 2664371, at *6 (D. Del. Sept. 10, 2026) (quoting *Wolford*, 146 S. Ct. at 2043-44). Connecticut's ban on "convertible pistols" meets all three of these requirements. It makes it a felony to import, advertise, sell, or offer or expose for sale any

"convertible pistol" to anyone in Connecticut ("members of the political community"). GLOCK pistols are unquestionably "Arms." *Bruen*, 597 U.S. at 32 ("handguns are weapons 'in common use' today for self-defense."); *District of Columbia v. Heller*, 554 U.S. 570, 581-82 (2008) (explaining that the term "Arms" covers "any thing that a man … takes into his hands, or useth in wrath to cast at or strike another" and that "all firearms constituted 'arms'" as such term was used at the Founding); *see also ANJRPC 2026*, 183 F.4th at 239 ("Because semi-automatic rifles"—like the semiautomatic pistols at issue in this case—"are firearms, they are 'Arms' within the meaning of the Second Amendment.").

Connecticut's "convertible pistol" ban restricts both the keeping and the bearing of the arms to which it applies because it makes it virtually impossible to legally purchase or acquire a "convertible pistol" manufactured on or after October 1, 2026 and, therefore, meaningfully constrains the right to possess and carry arms. "[T]he right to 'keep and bear arms' surely implies the right to purchase them." *Reese v. ATF*, 127 F.4th 583, 590 (5th Cir. 2025) (citing *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring) ("Constitutional rights ... implicitly protect those closely related acts necessary to their exercise."); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms.")); *see also Drummond v. Robinson Twp.*, 9 F.4th 217, 227 (3rd Cir. 2021) (holding that laws "prohibiting the commercial sale of firearms would be untenable in light of *Heller*") (internal citation and quotation marks omitted). Further, *Wolford* clarifies that a law that "burdens those wishing to exercise their Second Amendment right" "fall[s] within the plain text of the Second Amendment," no matter how it imposes that burden. 146 S. Ct. at 2047-49.

The "convertible pistol" ban, while expressly regulating the commercial activities related

to the import, advertisement, sale, and offer or exposure for sale, violates the Second Amendment because it has the necessary "effect of prohibiting law-abiding, responsible citizens from possessing common-use weapons." *Gazzola v. Hochul*, 88 F.4th 186, 196 n.6 (2d Cir. 2023). The "convertible pistol" ban therefore imposes a burden on people seeking to keep and bear arms, particularly because it bans (to the extent it is even applicable to the Slimline, V Series, and Gen6 GLOCK pistols) not just firearms that are "in common use," *Bruen*, 597 U.S. at 47, but the most popular pistols in America, with pistols being the type of firearm that is "overwhelmingly chosen by American society" for the lawful purpose of self-defense. *Heller*, 554 U.S. at 628-29.[5] Indeed, more than 2.25 million GLOCK pistols were manufactured by Glock, Inc. in the United States between 2020 and 2024 alone,[6] and U.S. manufactured pistols represent only roughly 20-25% of the GLOCK pistols that Glock, Inc. sells each year. In fact, over 26 million GLOCK pistols have been sold in the United States.

---

[5] *See Nat'l Assn. of Gun Rights v. Lamont*, 153 F.4th 213, 242 (2d Cir. 2025) (referring to the GLOCK Model 17 pistol as a "popular semiautomatic handgun[]"; *Bianchi v. Brown*, 111 F.4th 438, 455 (4th Cir. 2024) (en banc) (referring to the GLOCK Model 19 pistol as a "commonly used handgun"); *Heller v. District of Columbia*, 670 F.3d 1244, 1269 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ([T]he vast majority of [handguns] . . . are semi-automatic."). Indeed, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") has recognized that GLOCK pistols are "popular for civilian use." *See Definition of "Frame or Receiver" and Identification of Firearms*, 87 Fed. Reg. 24652, 24655 (Apr. 26, 2022).

[6] ATF, *Annual Firearms Manufacturing & Export Report* (2024) at 15 (419,510 GLOCK pistols were manufactured in the United States in 2024), https://www.atf.gov/media/30721/download; ATF, *Annual Firearms Manufacturing & Export Report* (2023) at 16 (345,119 GLOCK pistols were manufactured in the United States in 2023), https://www.atf.gov/media/15716/download; ATF, *Annual Firearms Manufacturing & Export Report* (2022) at 16 (465,117 GLOCK pistols were manufactured in the United States in 2022), https://www.atf.gov/media/22771/download; ATF, *Annual Firearms Manufacturing & Export Report* (2021) at 13 (581,944 GLOCK pistols were manufactured in the United States in 2021), https://www.atf.gov/media/22776/download; ATF, *Annual Firearms Manufacturing & Export Report* (2020) at 15 (419,510 [*sic*] GLOCK pistols were manufactured in the United States in 2020), https://www.atf.gov/media/22781/download (however, the correct figure for 2020 is 445,442 pistols).

**B. There Is No Historical Tradition of Banning Arms in Common Use on the Basis that Criminals May Seek to Modify Them.**

Since the "convertible pistol" statute proscribes conduct that is presumptively protected by the Second Amendment, the statute can stand only if Connecticut shows that it is "consistent with the principles that underpin our regulatory tradition." *ANJRPC 2026*, 183 F.4th at 239 (quoting *Rahimi*, 602 U.S. at 692). Under this second step of the Court's Second Amendment analysis, the burden shifts to the government to "affirmatively prove that its firearm regulation is part of the historical tradition that delimits … the right to keep and bear arms." *Bruen*, 597 U.S. at 19. Although this inquiry may consider various sources, *Wolford*, 146 S. Ct. at 2044, the "best evidence" is what the *Bruen* decision referred to as "historical analogues": "[o]ld legal rules from which a court may draw a strong inference that the modern law at issue is consistent with the codified right." *Id.* The government must cite "well-established and representative historical analogue[s]," *Bruen*, 597 U.S. at 30 (emphasis omitted), that restricted arms-bearing conduct for both "similar reasons" as the challenged law, and to a similar "extent" as "was done at the founding." *Rahimi*, 602 U.S. at 692. Further, "[t]he 'lack of a distinctly similar historical regulation … is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.'" *ANJRPC 2026*, 183 F.4th at 246 (quoting *Bruen*, 597 U.S. at 26).

When a law such as Connecticut's "convertible pistol" ban attempts to categorically ban a certain class of firearms, there is no need to conduct an extensive historical analysis. This is because the Supreme Court already conducted that analysis and held that there is no historical tradition that would allow a state to ban arms that "law-abiding citizens" "typically possess[] … for lawful purposes." *Heller*, 554 U.S. at 625; *Bruen*, 597 U.S. at 19. The ultimate issue in the *Heller* decision was whether the District of Columbia's handgun ban was constitutional, and to answer that question, the Court had to determine the type of weapons the Second Amendment

protects. *Heller*, 554 U.S. at 624. The Court's holding that the Second Amendment protects the weapons in common use for lawful purposes, *id.* at 624, 627, renders Connecticut's ban on "convertible pistols" unconstitutional.

The only difference between the District of Columbia and Connecticut bans are that the former applied to all handguns, and the latter applies to the most popular and commonly owned pistols. That difference has no legal significance. The fact that Connecticut does not ban pistols without a cruciform trigger bar does not make its ban on such pistols any less unconstitutional. *Heller*, 554 U.S. at 629 (holding that it is "no answer to say … that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed"). Because GLOCK pistols are among "the most popular weapon[s] chosen by Americans for self-defense in the home," *id.*, the Second Amendment prevents Connecticut from banning them.

Despite this clear and binding precedent from the Supreme Court, in *Nat'l Ass'n for Gun Rts. v. Lamont* the Second Circuit concluded that the Second Amendment does not "*necessarily* protect[] *all* weapons in common use" and does not "shield popular weapons from review of their potentially unusually dangerous character." 153 F.4th 213, 232-33 (2d Cir. 2025). The *Lamont* decision is irreconcilable with *Bruen*, *Heller*, *ANJRPC 2026*, and other precedents, and the Supreme Court has already granted *certiorari* to review it. *Id. cert. granted sub nom. Grant v. Higgins*, No. 25-566, 2026 WL 1871312 (U.S. June 30, 2026). Nevertheless, Connecticut's "convertible pistol" ban is unconstitutional even under the *Lamont* decision, which actually used GLOCK pistols as an example of firearms that are not considered to be "offensive" or "usually dangerous" weapons. *Id.* at 242. Specifically, the *Lamont* court noted that it considered the ban at issue in that case to be constitutional in part because it allowed "Connecticut residents to own and possess *popular* semiautomatic handguns *like the Glock 17*." *Id.* (emphasis added).

However, the "convertible pistol" statute at issue here seeks to ban the very pistols that the Second Circuit highlighted as an example of the firearms that are clearly protected by the Second Amendment.

States can regulate "dangerous and unusual weapons," such as pistols that have been illegally converted to machineguns. *Heller*, 554 U.S. at 627. But the "Second Amendment protects the possession and use of weapons that are in common use at the time." *Bruen*, 597 U.S. at 21. Semiautomatic pistols are the "'quintessential self-defense weapon.'" *Id.* at 47 (quoting *Heller*, 554 U.S. at 629). Semiautomatic pistols are "the weapons most commonly used today for self-defense." *Caetano v. Massachusetts*, 577 U.S. 411, 417-18 (2016) (Alito, J., concurring in the judgment). *Accord Snope v. Brown*, 145 S. Ct. 1534, 1534 (2025) (Kavanaugh, J., respecting the denial of certiorari) (noting that "most handguns" today "are semi-automatic").

As the Supreme Court has explained, "virtually any semiautomatic weapon may be converted" "into a machinegun." *Staples*, 511 U.S. at 615. Despite the potential to illegally convert them into machineguns, the Supreme Court has held that semiautomatic firearms remain "lawful" to "possess[]." *Id.* at 612 (addressing the illegal conversion of a semiautomatic rifle into a machinegun). The fact that the unmodified semiautomatic pistols are in common use negates any argument that they are "highly unusual in society at large." *Bruen*, 597 U.S. at 47.

Connecticut's "convertible pistol" statute bans pistols with cruciform trigger bars not on the basis that they are unusually dangerous in and of themselves, but rather on the basis that they can be illegally converted to machineguns using "pistol converters," devices that are already defined as machineguns and banned by both federal and Connecticut law. There is no historical tradition of banning firearms on that basis despite the fact that criminals have been converting firearms into unusually dangerous weapons since before the Founding. Criminals have always

been able to convert common firearms into dangerous and unusual booby traps, by attaching a string to the trigger so that they would automatically discharge if a door was opened, for example. The tradition at the Founding was to criminalize these so-called spring or trap guns, but to leave the unmodified firearm legal to purchase and possess. *See, e.g.*, 1771 N.J. Laws 346, § 10 (prohibiting the "most dangerous" practice of setting guns to discharge by "string, rope or other contrivance").

Further, there can be no debate that criminals have always been able to convert rifles and shotguns commonly used for hunting, self-defense, and other lawful purposes into short-barreled rifles and short-barreled shotguns that have been regulated by the National Firearms Act, 26 U.S.C. §§ 5841-54, since 1934. Such firearms have never been banned simply because they can be modified to a condition in which they are generally illegal to possess. More recently, criminals have increasingly begun illegally converting commonly owned semiautomatic firearms into machineguns, but before this year, the laws responding to such criminal acts have followed the Founding-era tradition of banning the conversion of the firearm, not the unmodified firearm itself. If Connecticut could lawfully ban semiautomatic pistols with cruciform trigger bars because they can be illegally converted to machineguns through the installation of a "pistol converter," then states could ban "virtually any semiautomatic weapon" for the same reason. *Staples*, 511 U.S. at 615. Connecticut's impending ban on "convertible pistols" has no historical support and is clearly a violation of the Second Amendment right to keep and bear arms.

Defendants' failure to advise whether the State considers the Slimline, V Series, and Gen6 GLOCK pistols to fall within the definition of a "convertible pistol" pursuant to Conn. Gen. Stat. § 53-202(a)(4) further compounds the irreparable harm to Glock, Inc. and Connecticut citizens. Absent this Court's urgent intervention, the importation, advertisement, and sale of such pistols

manufactured on or after October 1, 2026 will be banned notwithstanding (1) the design differences that make the Slimline series of GLOCK pistols not "readily altered by hand or with a common household tool" to install a "GLOCK pistol converter" on them, Watkins Decl. ¶ 18, and (2) the "triple block" in the V Series and Gen6 GLOCK pistols shields the trigger bar from a "GLOCK pistol converter" being installed on them. *Id.* ¶ 21.

## II. Connecticut's "Convertible Pistol" Ban Impermissibly Infringes on Glock, Inc.'s Right to Free Speech.

Glock, Inc. seeks to engage in all manners of protected expression—including political, ideological, and educational speech, as well as commercial speech—concerning GLOCK pistols. But Connecticut's prohibition on "convertible pistols" flatly bans Glock, Inc.'s existing and intended speech based on the content and viewpoint of Glock, Inc.'s message and its lawful semiautomatic pistols. No matter what level of scrutiny applies, the result is the same: Connecticut cannot prove the constitutionality of its speech restrictions. This Court should thus hold that Glock, Inc. is likely to succeed on its claim that Connecticut's "convertible pistol" ban violates its free-speech rights.

### A. The First Amendment Protects Glock, Inc.'s Speech.

The First Amendment no doubt protects Glock, Inc.'s speech about its lawful products. It is not obscene, defamatory, or fraudulent. It does not advocate for imminent lawless action or solicit others to commit crimes. Glock, Inc.'s publications regarding its lawful semiautomatic pistols involve speech that ranges from purely political to commercial—and it all pertains to the exercise of the right to keep and bear arms. *See*, *e.g.*, *Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 563-64 (1980) (holding that commercial speech receives First Amendment protection if it is not misleading and concerns a lawful activity); *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (holding that speech about "politics, nationalism,

religion, or other matters of opinion" has long been considered the core of the First Amendment); *Junior Sports Magazines Inc. v. Bonta*, 80 F.4th 1109 (9th Cir. 2023) (holding that ban on firearm-related magazine imposed excessive burden on protected speech); *Nordyke v. Santa Clara*, 110 F.3d 707, 710 (9th Cir. 2009) (holding that a statute prohibiting the "offering for sale" of legal firearms is protected speech).

For example, Glock, Inc.'s "GLOCK Annual"[7] and "GLOCK Buyer's Guide"[8] publications (in both electronic and print formats), its website, and its social media pages include images and written depictions of GLOCK pistols. These publications also feature articles by and for GLOCK pistol owners and law enforcement agencies discussing firearms safety, the features of GLOCK pistols, and their endorsement of Glock, Inc.'s products. None of Glock, Inc.'s advertising encourages the unlawful modification or illegal possession and/or use of GLOCK pistols. These advertisements are intended for an audience of lawful citizens who may choose to exercise their rights to keep and bear GLOCK pistols for lawful purposes. Consequently, the speech found within Glock, Inc.'s publications of its lawful products covers all categories of protected speech, none of which could survive an enforcement action by the State based upon Connecticut's draconian ban on the "advertisement, sale, offer or exposure for sale" of "convertible pistols." Connecticut's "convertible pistol" ban prohibits this otherwise protected speech.

**B. Connecticut's "Convertible Pistol" Ban Is an Impermissible Content- and Viewpoint-Based Restriction on Speech.**

While Connecticut's "convertible pistol" ban might technically ban misleading or unlawful speech promoting the unlawful modification of firearms, it is in no way limited to such speech. Rather, it ensnares all protected political, educational, and commercial speech—speech that

---

[7] *See*, *e.g.*, https://cloud.3dissue.net/35876/35839/41752/142461/index.html?page=1.

[8] *See*, *e.g.*, https://cloud.3dissue.net/35876/35839/36184/142460/index.html?page=1.

constitutes all of Glock, Inc.'s publications in electronic, print and social media.

Government restrictions that selectively ban speech based on its "particular subject matter" or "its function or purpose" are "content-based regulations." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Because Connecticut's "convertible pistol" ban is a content-based speech restriction, it is presumed invalid and may be upheld—in "rare" instances—only if the government proves it is "narrowly tailored to serve [a] compelling state interest" under strict scrutiny. *Chiles v. Salazar*, 607 U.S. 627, 640 (2026) (quoting *Reed*, 576 U.S. at 163; *Brown v. Entertainment Merchants Assn.*, 564 U.S. 786, 799 (2011)). But even under the somewhat less-demanding intermediate scrutiny, Connecticut must prove that its complete ban on Glock, Inc.'s speech concerning its lawful products is "narrowly tailored to serve a significant government interest." *Packingham v. North Carolina*, 582 U.S. 98, 105-06 (2017) (striking down law that made it a felony for a registered sex offender to access a commercial social networking websites). It is well established that the government "may not suppress lawful speech as the means to suppress unlawful speech," *id*. at 109 (citation omitted), and the ban on "convertible pistols" is not closely drawn to avoid suppression of Glock, Inc.'s lawful speech. Indeed, Connecticut has no actual compelling or substantial interest in banning Glock, Inc.'s political and educational speech concerning its lawful firearms. And its purported interests in banning "convertible pistols" is inconsistent with the fact that, under both federal and Connecticut law, the "pistol converters" themselves are already illegal to possess.

Connecticut apparently believes that the exercise of the right to keep and bear arms by lawful citizens acquiring lawful GLOCK pistols can be curbed based solely on a criminal's potential acquisition and use of an already illegal device and, therefore, any speech associated with the lawful pistol must be censured under the threat of felony criminal penalties. But Connecticut

may not ban constitutionally protected speech to indirectly advance an illegitimate interest in banning constitutionally protected products.

The fact that Connecticut's "convertible pistol" ban also restricts speech that proposes a commercial transaction does not change the result. Commercial speech receives First Amendment protection if it is not misleading and concerns lawful activity. *Cent. Hudson Comm'n*, 447 U.S. at 563-64. Government restrictions on such speech are constitutional only if they "directly advance" a "substantial" government interest and are "not more extensive than is necessary to serve that interest." *DoorDash, Inc. v. City of New York*, 185 F.4th 1, 8 (2d Cir. 2026) (quoting *Cent. Hudson Comm'n*, 447 U.S. at 564). But instead of targeting only speech promoting unlawful activity, Connecticut chose to unlawfully ban all speech concerning legal and constitutionally protected products, including necessarily any content depicting lawful conduct associated with the legal ownership and use of such products. *See*, *e.g.*, *U.S. v. Caronia*, 703 F.3d 149, 167 (2d Cir. 2012) (holding that "a complete and criminal ban on off-label promotion by pharmaceutical manufacturers is more extensive than necessary to achieve the government's substantial interests.").

Further, by denying Connecticut citizens access to truthful information concerning lawful GLOCK pistols, the State improperly assumes that this information is itself harmful, but Connecticut cannot justify content-based restrictions based on the "fear that people would make bad decisions if given truthful information." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 374 (2002); *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 557 (2011). And the First Amendment directs courts "to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484,

503 (1996) ("[B]ans against truthful, nonmisleading commercial speech ... usually rest solely on the offensive assumption that the public will respond 'irrationally' to the truth....).

## III. The Remaining Injunction Factors Overwhelmingly Support Enjoining The Convertible Pistol Ban.

### A. Enforcement of the "Convertible Pistol" Ban Will Cause Irreparable Harm.

The ban on "convertible pistols" will cause irreparable harm to Glock, Inc. and Connecticut citizens by preventing them from being able to acquire (a necessary predicate to the ability to keep and bear), the most popular pistol in the country. In the Second Circuit, irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction." *Cumulus Media New Holdings Inc. v. Nielsen Company (US), LLC*, 182 F.4th 108, 136-37 (2d Cir. 2026). Without an injunction, Connecticut citizens will be deprived of their Second Amendment rights for an indefinite period of time while this Court decides Glock, Inc.'s request for declaratory judgment, all while Glock, Inc. is deprived of its customers' good will and market share. Such a deprivation of citizen's rights to keep and bear arms is irreparable, as has been recognized by multiple federal courts, including, most recently, the Delaware District Court. *See Rigby*, 2026 WL 2664371, at **13-14; *id.* at *14 ("[T]he public has an interest in ensuring that law-abiding citizens can exercise their constitutional rights whereas the government has no countervailing interest in enforcing an unconstitutional statute.") (citing *ACLU v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003) ("[N]either the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law.")).[9]

[9] Such irreparable injury has also been recognized by multiple federal appellate courts. *See, e.g.*, *Ortega v. Grisham*, 148 F.4th 1134, 1142 (10th Cir. 2025); *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023); *Wrenn v. District of Columbia*, 864 F.3d 650, 667-68 (D.C. Cir. 2017); *Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 457 (5th Cir. 2016); *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011).

Although the Second Circuit has not yet explicitly held that violations of the right to keep and bear arms constitute irreparable injury, *see Lamont*, 153 F.4th at 248 (assuming without deciding that Second Amendment violations automatically give rise to irreparable injury), it has held that violations of the First,[10] Fourth, and Eighth Amendments automatically constitute irreparable injury. *Id.* But the Second Circuit has recently affirmed the issuance of a preliminary injunction where the government failed to "carry its burden of establishing a national tradition of regulating firearms in the manner attempted" by New York's attempt to ban the carriage of weapons on or in private property. *Christian v. James*, 176 F.4th 189, 201-202 (2d Cir. 2026). Further, the Second Circuit has noted that it has been "reluctant to run afoul of the Supreme Court's admonishment that the Second Amendment is not a 'second-class right' by treating this constitutional harm differently than we have treated others in the past." *Lamont*, 153 F.4th at 248 (citation omitted). This suggests that the Second Circuit will likewise treat violations of the Second Amendment as constituting irreparable harm. And Second Circuit precedent is clear: it is proper for firearm manufacturers, like Glock, Inc., to "bring a derivative constitutional challenge" "on behalf of their customer base." *Gazzola*, 88 F.4th at 194-95.

Glock, Inc.'s loss of good will and loss of revenue from in-state federally licensed firearms dealers' inability to import and sell GLOCK pistols to Connecticut consumers, including sales made by dealers that participate in the Glock Stocking Dealer program that have contractual agreements with Glock, Inc. to purchase GLOCK pistols for re-sale to consumers, also constitutes irreparable harm for purposes of injunctive relief. A company's loss of good will, longtime customers, and market share are among those harms for which "there is a substantial chance that

[10] The ban on advertisement of "convertible pistols" violates the First Amendment, particularly given the vague scope of what is considered to constitute a prohibited advertisement.

upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Cumulus Media*, 182 F.4th at 136-37 (affirming the district court's finding of a likelihood of irreparable harm in the form of loss of customers, good will, and market share) (citing *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 907-08 (2d Cir. 1990) (loss of good will and loss of customers); *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 67 (2d Cir. 2007) (loss of meaningful market share)). This is because sovereign immunity prevents Glock, Inc. from recovering damages from Connecticut for lost sales. And while Glock, Inc. sells pistols with design features that inhibit the installation of a MCD, all GLOCK pistols use a cruciform trigger bar and one or more of the defendants could subjectively determine that all GLOCK pistols fall within the definition of a prohibited "convertible pistol." *See Council for Responsible Nutrition v. James*, 159 F.4th 155, 172 (2d Cir. 2025) ("Unrecoverable lost sales … can constitute irreparable harm."); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (similar).

### B. The Equities and Public Interest Demonstrate the Need for Emergency Injunctive Relief.

Glock, Inc. is seeking injunctive relief against Connecticut state officials acting in their official capacities, as a result of which the factors related to a balancing of the equities (hardships) and the public interest merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Further, because Glock, Inc. is challenging the governmental defendants' potential enforcement of the ban on "convertible pistols"—both facially with respect to pistols that have cruciform trigger bars and as applied to the Slimline, V Series, and Gen6 GLOCK pistols—as being unconstitutional, these factors further merge with the merits analysis. *N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (collecting cases for the proposition that the likelihood of success on the merits "is the dominant, if not the dispositive, factor" in cases seeking injunctive relief based on constitutional violations). *See also Ortega*, 148 F.4th at 1154 n.13; *Brown v. Yost*, 133 F.4th 725, 737-38 (6th

Cir. 2025); *Book People, Inc. v. Wong*, 91 F.4th 318, 340-41 (5th Cir. 2024); *Schrader v. D.A. of York Cnty.*, 74 F.4th 120, 128 (3d Cir. 2023); *Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020). This is because Connecticut "does not have an interest in the enforcement of an unconstitutional law," and it is in the public interest to not infringe both the right to keep and bear arms protected by the Second Amendment and the right to publish constitutionally protected, non-misleading commercial speech protected by the First Amendment. *N.Y. Progress & Protection PAC*, 733 F.3d at 488; *Rigby*, 2026 WL 2664371, at **13-14; *see also Nat'l Shooting Sports Found. v. Davenport*, __ F.4th __, 2026 WL 2639295, at *5 (3d Cir. Sept. 8, 2026) (citing *Sorrell*, 564 U.S. at 557). Accordingly, because the factor related to the likelihood of success on the merits weighs in favor of enjoining enforcement of the "convertible pistol" ban, both facially and as applied to Slimline, V Series, and Gen6 GLOCK pistols, the merged equities/public-interest factor does as well.

GLOCK pistols with their Safe Action System and cruciform trigger bar have been legal to import into, advertise, sell and offer or expose for sale in Connecticut since Glock, Inc. first began selling them more nearly forty years ago. MCDs, defined as "pistol converters" by HB 5043, have been available for almost as long, and have always been prohibited as machineguns by federal and Connecticut law. Further, although the language used in HB 5043 is vague and confusing, it does not appear that the ban on "convertible pistols" even applies to the Slimline, V Series, and Gen6 GLOCK pistols that Glock, Inc. currently sells for subsequent resale to civilians in Connecticut. This Court should therefore enjoin enforcement of Connecticut's "convertible pistol" ban and maintain the status quo pending a decision on Glock, Inc.'s request for a declaratory judgment that the ban on "convertible pistols" does not apply to the Slimline, V Series, and Gen6 GLOCK pistols and that the ban is unconstitutional.

## CONCLUSION

For the above reasons, Glock, Inc. respectfully requests that this Court enter a temporary restraining order and preliminary injunction enjoining enforcement of the "convertible pistol" ban pending resolution of Glock, Inc.'s request for a declaratory judgment, and grant such other relief as it deems just and proper.

Dated: September 21, 2026

**PLAINTIFF**
**GLOCK, INC.**

*/s/ Christopher Renzulli*

By: Christopher Renzulli (CT24597)
Peter V. Malfa (CT30903)
Scott C. Allan (CT24143)
**RENZULLI LAW FIRM, LLP**
One North Broadway, Suite 1005
White Plains, New York 10601
Telephone: (914) 285-0700
Email: crenzulli@renzullilaw.com
pmalfa@renzullilaw.com
sallan@renzullilaw.com