UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GLOCK, INC. | : | |
| *Plaintiff*, | : | Civil Action No.: 3:26-cv-01525 |
| v. | : | |
| | : | |
| PATRICK J. GRIFFIN, in his official | : | |
| capacity as Chief State's Attorney et al., | : | SEPTEMBER 28, 2026 |
| *Defendants*. | : | |

**DEFENDANTS' OPPOSITION TO GLOCK, INC.'S EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION TO BAR DEFENDANTS FROM ENFORCING CONNECTICUT'S BAN ON "CONVERTIBLE PISTOLS" PENDING A DECISION ON ITS REQUEST FOR DECLARATORY JUDGMENT**

WILLIAM TONG
ATTORNEY GENERAL

Edward D. Rowley (ct30701)
Jacob L. McChesney (ct30282)
August L. Pozgay (ct31901)
Assistant Attorneys General
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
Jacob.McChesney@ct.gov
August.Pozgay@ct.gov
Edward.Rowley@ct.gov
Tel.: (860) 808-5450
Fax: (860) 808-5591

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

BACKGROUND ..... 3

A. Conversion of Semiautomatic Firearms to Machineguns ..... 3

B. Public Act No. 26-41 ..... 6

C. Glock, Inc.'s Limited Efforts to Engage the State ..... 7

D. Procedural History ..... 8

STANDARD OF REVIEW ..... 8

ARGUMENT ..... 9

I. PLAINTIFF CANNOT SHOW A LIKELIHOOD OF SUCCESS ..... 9

A. Plaintiff's Facial Challenge is Unlikely to Succeed. ..... 9

B. PA 26-41 Does Not Violate the Second Amendment Because Regulating Readily Convertible Firearms Fits the Historical Tradition of Arms Laws. ..... 13

C. The Plaintiff Is Not Likely to Succeed On Its First Amendment Challenge ..... 26

II. PLAINTIFF CANNOT DEMONSTRATE IRREPARABLE HARM ..... 28

A. The Harm Alleged by Plaintiff is Remote and Speculative. ..... 29

B. The Record Lacks Any Evidence of Alleged Future Loss of Good Will and Loss of Revenue Thus Plaintiff Cannot Establish Imminent Harm. ..... 30

C. Plaintiff's Delay in Seeking Relief from a Bill Passed More Than Four Months Ago Supports Denying the Motion. ..... 31

D. Laches Bars Plaintiff's Request for the Extraordinary Remedy of a TRO. ..... 32

III. PUBLIC INTEREST AND BALANCE OF THE EQUITIES WEIGH AGAINST AN INJUNCTION ..... 38

CONCLUSION ..... 40

## TABLE OF AUTHORITIES

**Cases**

*Allstate Ins. Co. v. Serio*, 261 F.3d 143 (2d Cir. 2001) .............................................................. 10

*Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024) .............................................................. 14, 15

*Armstrong v. Virgin Records, Ltd.*, 91 F. Supp. 2d 628 (S.D.N.Y. 2000) ..................................... 35

*Atkinson v. Garland*, 70 F.4th 1018 (7th Cir. 2023) ................................................................. 36

*Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469 (1989) ..................................................... 27

*Bray v. City of N.Y.*, 346 F. Supp. 2d 480 (S.D.N.Y. 2004) .......................................................... 33

*Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491 (1985) ............................................................. 40

*Capen v. Campbell*, 134 F.4th 660 (1st Cir. 2025) ........................................................................ 24

*Carter v. Sewell*, No. 1:23-cv-01139 (JLR) (RWL), 2023 U.S. Dist. LEXIS 194682 (S.D.N.Y. Oct. 31, 2023) ......................................................................................................................... 9, 31, 32

*Carver v. Nassau County Interim Finance Authority*, 730 F.3d 150 (2d Cir. 2013) ..................... 10

*Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557 (1980) ........................ 27

*Colon v. BATFE*, No. 8:23-cv-223-MSS-UAM, 2024 U.S. Dist. LEXIS 13966 (M.D. Fla. Jan. 26, 2024) ......................................................................................................................................... 37

*Copeland v. Vance*, 893 F.3d 101 (2d Cir. 2018) ....................................................................10, 11

*Costello v. United States*, 365 U.S. 265 (1961)............................................................................... 37

*Council for Responsible Nutrition v. James*, 159 F.4th 155 (2d Cir. 2025) ................................. 30

*Counterman v. Colorado*, 600 U.S. 66 (2023) ................................................................................ 28

*Cumulus Media New Holdings Inc. v. Nielsen Co. US, LLC*, 182 F.4th 108 (2d Cir. 2026) ........ 30

*Cumulus Media New Holdings, Inc. v. Nielsen Co. (US) LLC*, Docket No. 25-CV-08581 (JAV), 2025 U.S. Dist. LEXIS 269944 (S.D.N.Y. Dec. 30, 2025) ..................................................... 30

*Def. Distributed v. Bonta*, No. CV 22-6200-GW-AGRx, 2022 U.S. Dist. LEXIS 195839 (C.D. Cal. Oct. 21, 2022) ........ 37

*Dickerson v. Napolitano*, 604 F.3d 732 (2d Cir. 2010) ........ 12

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ........ 20

*Duncan v. Bonta*, 133 F.4th 852 (9th Cir. 2025) ........ 15, 20, 21, 22, 23

*Edenfield v. Fane*, 507 U.S. 761 (1993) ........ 27

*Frey v. City of New York*, 157 F.4th 118 (2d Cir. 2025) ........ 14, 15

*Granata v. Campbell*, 798 F. Supp. 3d 46 (D. Mass. 2025) ........ 18, 19

*Grand River Enter. Six Nations v. Pryor*, 481 F.3d 60 (2d Cir. 2007) ........ 8, 30

*Grand River Enterprises Six Nations, Ltd. v. Pryor*, 2006 U.S. Dist. LEXIS 35614 (S.D.N.Y. May 31, 2006) ........ 30

*H2O v. Town Bd. of the Town of E. Hampton*, No. CV 15-cv-2349, 2015 U.S. Dist. LEXIS 160413 (E.D.N.Y. Oct. 15, 2015) ........ 35, 36

*Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104 (2d Cir. 2002) ........ 33

*Ir. Lesbian & Gay Org. v. Giuliani*, 918 F. Supp. 732 (S.D.N.Y. 1996) ........ 33, 36

*Lore v. City of Syracuse*, U.S. Dist. LEXIS 26942, 2001 WL 263051 (N.D.N.Y. Mar. 9, 2001) . 29

*Mintz v. Chiumento*, 724 F. Supp. 3d 40 (N.D.N.Y. 2024) ........ 32, 33, 36

*Nat'l Assn. Gun Rights v. Lamont*, 153 F.4th 213 (2nd Cir. 2025) 16, 17, 18, 21, 23, 25, 28, 29, 40

*Nat'l Council of Arab Ams. v. City of N.Y.*, 331 F. Supp. 2d 258 (S.D.N.Y. 2004) ........ 35, 36

*Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98 (2d Cir. 2025) ........ 10, 11

*New Era Publ'ns Int'l, ApS v. Henry Holt & Co.*, 684 F. Supp. 808 (S.D.N.Y. 1988) ........ 33

*New York State Firearms Assn. v. Nigrelli*, 2023 U.S. Dist. LEXIS 222331 (W.D.N.Y. Sep. 21, 2023) ........ 29

*New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022)........... 2, 13, 14, 15, 16, 36

*Norton v. Town of Brookhaven*, Docket No. 22-1015-cv, 2023 U.S. App. LEXIS 11912 (2d Cir. May 16, 2023)........................................................................................................ 10

*Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447 (1978) ............................................................... 27

*Omnistone Corp. v. Cuomo*, 485 F. Supp. 2d 365 (E.D.N.Y. 2020)......................................... 9, 32

*Perry v. Judd*, 840 F. Supp. 2d 945, 954 (E.D. Va. 2012)............................................................ 32

*Regan v. Time, Inc.*, 468 U.S. 641 (1984) .................................................................................... 40

*Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393 (2d Cir. 2004) .................................................... 31

*Republic of Turkey v. Christie's Inc.*, 62 F.4th 64 (2d Cir. 2023)................................................. 32

*Reuters, Ltd. v. United Press International, Inc.*, 903 F.2d 904 (2d Cir. 1990) ........................... 30

*Robins Island Pres. Fund, Inc. v. Southold Dev. Corp.*, 959 F.2d 409 (2d Cir. 1992) ................. 37

*Sam Party of N.Y. v. Kosinski*, 987 F.3d 267 (2d Cir. 2021) ........................................................... 8

*Seabrook v. Jacobson*, 153 F.3d 70 (2d Cir. 1998) ...................................................................... 10

*Shady v. Tyson*, 5 F. Supp. 2d 102 (E.DN.Y. 1998)....................................................................... 32

*Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432 (E.D.N.Y. 2013)....................................... 31

*Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.*, 190 F. Supp. 2d 577 (S.D.N.Y. 2022) ........................................................................................................................................ 9

*Stallworth v. Joshi*, 2017 U.S. Dist. LEXIS 219931 (S.D.N.Y. Nov. 22, 2017) .......................... 29

*Staples v. United States*, 511 U.S. 600 (1994) .............................................................................. 20

*State v. Carter*, 300 Conn. 43 (2024) ............................................................................................. 10

*Succow v. Blanche*, No. 3:25-CV-250 (SVN), 2026 U.S. Dist. LEXIS 163355 (D. Conn. July 23, 2026) ...................................................................................................................................... 22

*Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964 (2d Cir. 1995)......................................... 31

*Tri-Star Pictures v. Leisure Time Prods., B.V.*, 17 F.3d 38 (2d Cir. 1994) .................................... 33

*United States v. Rahimi*, 144 S. Ct. 1889 (2024) ............................................................ 2, 13, 23

*United States v. Salerno*, 481 U.S. 739 (1987) .....................................................................11, 12

*Wallikas v. Harder*, 78 F. Supp. 2d 36 (N.D.N.Y. 1999) ............................................................ 32

*Weight Watchers Int'l., Inc. v. Luigino's Inc.*, 423 F.3d 137 (2d Cir. 2005) ................................. 31

*Wolford v. Lopez*, 146 S. Ct. 2032 (2026) ......................................................................... 14

**Statutes**

1776 R.I. Pub. L. 25 ........................................................................................................ 19

1776-77 N.J. L. 6-7 c. 6 ................................................................................................... 19

1794 P.A. L. 764 c. 337 .................................................................................................... 19

1820 N.H. L. 274 c. 25 ...................................................................................................... 19

1821 Me. L. 546 c. 162 ..................................................................................................... 18

Act for the Inspection of Gunpowder, 1776-1777, N.J. Laws 6, ch.6 .......................................... 18

Conn. Gen. Stat. § 53a-3(12) ............................................................................................ 20

Public Act 26-41 ........................................... 1, 6, 9, 10, 12, 15, 16, 17, 18, 20, 22, 23, 25, 26, 38

Resolution of the Pennsylvania Committee on Safety, Oct. 27, 1775, Col. Rec. Penn. 10:383 ... 18

**Legislative History**

H.R. Proc., 2026 Sess. (Conn. 2026) ........................................................................... 5

## INTRODUCTION

Plaintiff Glock, Inc.'s case rests on a fundamental mischaracterization of Connecticut law. Because of the way they are designed, certain semiautomatic handguns with a cruciform trigger are easy to modify into fully automatic machine guns. The General Assembly addressed this obvious public safety problem on May 26, 2026, through Public Act (PA) 26-41. The law *does not* prohibit the purchase, sale, possession or carrying of all handguns with a cruciform trigger. It instead simply requires that, if manufacturers and retailers want to continue selling such guns manufactured after October 1, 2026, in Connecticut, they must install "a tab or other piece of material molded to the pistol's frame that shields the cruciform trigger bar from interference by a pistol converter" or modify the firearm in a different way that prevents it from being readily converted into a machine gun: a basic and common-sense safety requirement.

Even for those firearms lacking the safety feature Connecticut now requires, the law *does not* prohibit individuals from possessing, carrying, or purchasing such firearms through private transfers. And it only prohibits Plaintiff from selling them in Connecticut if they were manufactured after October 1, 2026. That means Plaintiff can continue selling any firearm manufactured before the law's effective date regardless of whether it has the required safety feature

Plaintiff has presumably known about the Act since its enactment. But it waited four months to challenge it and now inexplicably asks this Court for "emergency" relief—on an exceptionally truncated briefing and hearing schedule—enjoining the law just days before it goes into effect. The Court should deny that extraordinary relief and resolve this case in the normal course, for four reasons.

First, Plaintiff has no likelihood of success on the merits. To survive scrutiny the law need only fit with "the *principles* that underpin our regulatory tradition"; it need not match a historical

"twin" or "dead ringer." *United States v. Rahimi*, 144 S. Ct. 1889, 1897 (2024) (emphasis added). And in assessing fit for laws like this, which addresses "unprecedented societal concerns or dramatic technological changes" that did not exist at the Founding, the Supreme Court has demanded an even "more nuanced approach." *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1, 27 (2022). The law here readily comports with our long history and tradition of firearm regulation under this framework, including but not limited to: (1) laws requiring proving arms' safety to prevent injury or unlawful uses that jeopardize public safety; and (2) laws restricting machineguns and other unusually dangerous weapons.

Second, Plaintiffs have not and cannot establish irreparable harm. To start, they have presumably known about the law since it was passed on May 26, 2026. Yet they unreasonably delayed bringing this action for four months and now claim they need "emergency" relief just days before the law is set to go into effect, without giving Defendants adequate time to research and brief the complicated Second Amendment questions at issue. Laches bars their request, and even if it does not, Plaintiffs' unreasonable delay belies any notion that they face imminent and irreparable harm from the law.

Plaintiffs cannot establish irreparable harm for other reasons, too. The law expressly permits Plaintiff to sell any firearm without the required safety feature so long as it was manufactured before October 1, 2026. While Plaintiff's stock of such firearms conceivably might run out at some unknown and potentially distant time in the future, it has made no showing about when or how likely that is to occur.

Third, the public interest and the balance of the equities strongly favor the regulation of readily convertible pistols which, when a "switch" is attached and the trigger is depressed, can fire

1,200 rounds per minute, continuously until the ammunition runs out. That is especially true given the equitable concerns Plaintiff's unreasonable delay has caused.

Finally, Defendants submit that Plaintiff's emergency motion—which seeks a temporary restraining order (TRO) and a preliminary injunction—should be reviewed under the standard of a TRO only. To the extent the Court intends to treat it as a motion for preliminary injunction, Defendants request additional time to develop the record.[1]

## BACKGROUND

### A. Conversion of Semiautomatic Firearms to Machineguns

The Public Act at issue here addresses the class of semiautomatic pistols readily convertible by means of "switches." Specifically, for certain pistols incorporating a cruciform trigger bar, modification to incorporate a switch that allows those pistols to fire in a machinegun-like, automatic mode is simple, requiring no specialized skills or tools. The backplate at the rear of those pistols can be easily removed, allowing such a switch to be easily attached to the rear of the pistol. Installation of such a switch on these firearms can be accomplished in a matter of minutes by hand or by using common household tools.

According to the ATF, "MCDs pose an extraordinary threat to public safety."[2] Semiautomatic pistols that have been converted can fire up to 1,200 rounds per minute

---

[1] A matter of days is not enough time to gather evidence needed to sufficiently inform the Court so it may give due consideration of the public act in question. Defendants were served on Tuesday, September 22, 2026 in this matter. *Compare, e.g.,* Mem. Opp. Emergency Mot. Prelim. Injunction, *Nastri v. Dykes*, No. 3:23-cv-00056-VAB (D. Conn. Mar. 30, 2023), ECF No. 23 (memorandum in opposition to emergency motion for preliminary injunction in case challenging Connecticut gun regulation relying on 132 evidentiary exhibits, including historical analogues for *Bruen*; 9 affidavits; and two supplements of secondary sources and unreported decisions); *Id.* ECF No. 15 (Order denying emergency motion for TRO and setting expedited preliminary injunction briefing schedule allotting 66 days for Defendants to respond).

[2] "Machinegun Conversion Devices" Fact Sheet, Bureau of Alcohol, Tobacco, Firearms and Explosives, *available at* https://www.justice.gov/usao-wdok/media/1366621/dl (*last accessed* September 27, 2026).

continuously until the pistol runs out of ammunition.[3] **ATF demonstrated the alarming difference to news media at a firing range**.[4]

The continuous recoil caused by automatic fire in these modified pistols makes it extremely difficult to fire them with accuracy. Indeed, "the rapid recoil on such modified weapons makes them almost uncontrollable for adults and teenagers with no training."[5] For example, as one police chief noted: "there is no other reason to have guns with fully automatic conversion devices, other than to cause mass destruction quickly amongst large groups of people."[6] And the threat to police is substantial: "Most officers' guns carry either 11 or 16 rounds. That's most officers. And we're seeing more and more that . . . people are able to get off 50 to 100 shots in under a minute [with these modified weapons.]"[7]

Connecticut lawmakers identified the proliferation of illegal conversion switches, which easily transform pistols into fully automatic weapons, as a critical public safety threat within the state. One Connecticut legislator noted the following:

> "[M]achine guns are illegal in the State of Connecticut. . . . Yet, they are still showing up on our streets. In 2023 and 2024 alone, the Hartford Police Department confiscated 51 do-it-yourself machine guns. These are pistols that can be converted into fully automatic weapons using a tiny Lego-sized switch. The problem is not confined to Hartford, Mr. Speaker. There were recent arrests in Meriden, West Hartford, among several other communities in our state."

---

[3] Press Release, U.S. Attorney's Office, N.D. Tx., Fort Worth Manufacturer Charged in Glock Switch Case (Nov. 18, 2022), *available at* https://perma.cc/B35Z-4AXG (last accessed September 25, 2026).

[4] "ATF shows how a Glock Switch works," FOX 4 Dallas-Fort Worth, Jun. 10, 2024, *available at* https://www.youtube.com/watch?v=Tmyk9qm3wkQ (last accessed September 27, 2026).

[5] "Machine-gun conversion device dubbed 'Glock switches' taking violence to the 'next level': Experts," ABC News, *available at* https://abcnews.com/US/machine-gun-conversion-device-taking-violence-level-experts/story?id=110855649 (last accessed September 27, 2026).

[6] "Machine-gun conversion device dubbed 'Glock switches' taking violence to the 'next level': Experts," ABC News, *available at* https://abcnews.com/US/machine-gun-conversion-device-taking-violence-level-experts/story?id=110855649 (last accessed September 27, 2026).

[7] *Id.*

H.R. Proc., 2026 Sess., at 2299-2300 (Conn. 2026) (statement of Rep. Stafstrom).

This legislator then detailed three particularly egregious instances in which these modified firearms were utilized: “So, I’m looking at some of the testimony we received during the public hearing, and I know in at least one of those cases, the modified firearm switch was involved in a murder of a 20-year-old Hartford woman and her four-year-old son. I know, in another instance, there was a shooting in New Haven and a gang involved shooting in Bridgeport that injured a bystander in their own kitchen.” *Id*. at 2312.

Another representative highlighted Connecticut's alignment with other states in passing proactive legislation designed to curb gun violence and foster a safer environment. “They’re illegal in, I think, California, and in Maryland, and in Germany . . . . I’m hoping that we can not only follow these other jurisdictions that have done this, but that we can continue to be the proactive jurisdiction dealing with making our streets, and our homes, and our schools, and all of our institutions much more safe here in Connecticut.” *Id.* at 2404 (statement of Rep. Godfrey).

And one senator addressed Connecticut's crisis with pistol switches, emphasizing the urgent need to stop the flow of these easily convertible firearms: “Here’s what’s happening. These, Glock switches, they are becoming at a level of an epidemic. If we were to listen to the federal law enforcement agencies, if we were to listen to ATF, they are mentioning that in parts of the country, including Connecticut, there is a very large increase of these kind of semiautomatic convertible guns that are being created.” *Id.* at 3513 (statement of Senator Anwar).

Data presented during the Judiciary Committee’s public hearing underscored the urgent public safety need for legislators to ban pistol switches. The bill drew wide support at public

hearing from police to citizen advocacy groups.[8] Sixty-one (61) people and entities voiced support. *Id.* For example, the Connecticut Police Chiefs' Association's (CPCA's) written submission stated: "Law enforcement is concerned that an increase in rounds fired by an individual increases the likelihood that a member of the public or an officer will be struck by one of those rounds. CPCA members from larger urban municipalities have seen an increase in seizures of weapons modified with these 'switches' in recent years. CPCA is supportive of the increase in penalties and hopes that this will lead to fewer 'switches' that end up on our streets."[9] Supporters noted that such pistols, when converted into machine guns, were capable of firing at a rate of up to 1,200 rounds per minute and that Bureau of Alcohol, Tobacco, Firearms and Explosives data shows that recovery of machine gun conversion devices, including switches, increased 784% from 2019 to 2023.[10]

**B. Public Act No. 26-41**

Substitute House Bill No. 5043 was signed into law on May 26, 2026, as Public Act No. 26-41 (PA 26-41).[11] It provides, in part:

> Section 1 . . . (*Effective October 1, 2026*):
> (a) As used in this section: (1) "Machine gun" means (A) a weapon of any description, loaded or unloaded, that shoots, is designed to shoot or can be readily restored to shoot automatically more than one projectile, without manual reloading, by a single function of the trigger, including any convertible pistol that is equipped with a pistol converter, as defined in subsection (c) of section 53-206g . . . and (B) any part or combination of parts designed for use in converting a weapon into a machine gun and any combination of parts from which a machine gun can be assembled if such parts are in the possession of or under the control of a person.

---

[8] "Testimony for Bill Number HB-05043 In All Committees," Connecticut General Assembly, *available at* https://www.cga.ct.gov/aspx/CGADisplayTestimonies/CGADisplayTestimony.aspx?bill=HB-5043&doc_year=2026 (last accessed September 25, 2026).

[9] *Available at* https://www.cga.ct.gov/2026/juddata/TMY/2026HB-05043-R000311-CT%20Police%20Chiefs%20Association-Supports-TMY.PDF (last accessed September 25, 2026).

[10] *See* "Testimony for Bill Number HB-05043 In All Committees," *supra* n.2, written testimony of A. M.-G., Students Demand Action; Anonymous 606; Anonymous 620; L. L.; J. W.-N.; A.P.; E.T.

[11] Plaintiff refers to HB5043 in their briefing. As the bill is now a Public Act, the act is the referent for analysis.

> [ . . . ]
>
> (4) "Convertible pistol" means any semiautomatic pistol with a cruciform trigger bar that can be readily altered by hand or with a common household tool so that the pistol can be readily converted into a machine gun by the installation or attachment of a pistol converter, as defined in subsection (c) of section 53-206g, as amended by this act. "Convertible pistol" does not include (A) any hammer-fired semiautomatic pistol, or (B) any semiautomatic pistol with a cruciform trigger bar that has a tab or other piece of material molded to the pistol's frame that shields the cruciform trigger bar from interference by a pistol converter, unless the tab or other piece of material can be readily removed from the pistol's frame.
>
> (5) "Cruciform trigger bar" means a component in a semiautomatic pistol that serves as a linkage between the trigger and firing pin and has its sear incorporated in a cross-shaped surface.
>
> (6) "Common household tool" includes, but is not limited to, a knife, screwdriver, wrench, hacksaw, crowbar, electric drill, rotary tool, hammer, chisel, file or pliers.
>
> Sec. 3. . . . (Effective October 1, 2026)
> (a) Any individual or firm, partnership, corporation, limited liability company, association or other similar entity that knowingly imports into this state or knowingly advertises, sells, offers or exposes for sale any convertible pistol, as defined in section 53-202 of the general statutes, as amended by this act, that was manufactured on or after October 1, 2026, shall be guilty of a class D felony.
>
> (b) The provisions of this section shall not apply to sale at retail or other lawful transfer of a convertible pistol by a person who is not a licensed gun dealer to another person who is not a licensed gun dealer.[12]

**C. Glock, Inc.'s Limited Efforts to Engage the State**

In its brief, Plaintiff alleges it met with representatives of the Connecticut Office of the Attorney General, and two representatives of the Connecticut State Police Special Licensing and Firearms Unit. Pl. Br. at 10-11; see also ECF No. 1, ¶ 54.[13] Rather than provide a sample to the state for testing, Plaintiff "explained why" its models "do not fall within the definition of a

[12] Public Act No. 26-41, *available at* https://www.cga.ct.gov/2026/ACT/PA/PDF/2026PA-00041-R00HB-05043-PA.PDF (last accessed September 25, 2026).

[13] The undersigned counsel did not attend this meeting.

'convertible pistol' using demonstratives. *Id.* According to Plaintiff's recitation of the meeting, none of the participants provided an answer to Plaintiff's request for the State's position regarding whether its models are covered by the act.[14] *Id.*; see also ECF No. 1, ¶ 56. When Plaintiff did not receive a coverage answer—as none of the participants to the meeting had the authority to issue one, nor upon information and belief was it known to be an agenda item prior to the meeting—it then allegedly sent a letter to the Chief State's Attorney on September 8, 2026, requesting the same. *Id.*; see also ECF No. 1, ¶ 57.

**D. Procedural History**

Plaintiff filed its complaint and emergency motion for TRO on September 21, 2026. ECF Nos. 1, 3.[15] The Court ordered Defendants to file a response to the motion by 5:00 p.m. on September 28, 2026. ECF No. 15. Defendants now file their response.

## STANDARD OF REVIEW

"The preliminary injunction is one of the most drastic tools in the arsenal of judicial remedies." *Grand River Enter. Six Nations v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted). "To obtain a preliminary injunction against government enforcement of a statute, the [movant] must establish (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm if the injunction is not granted, (3) that the balance of the equities tips in its favor, and (4) that the injunction serves the public interest." *Sam Party of N.Y. v. Kosinski*, 987 F.3d 267, 273-74 (2d Cir. 2021).

[14] Defendants reserve the right to dispute Plaintiff's allegations regarding the contents of this meeting. However, the Court need not reach this issue as described more fully below.

[15] This office received service of the instant action on Wednesday, September 23, 2026, and of *NSSF*, Docket No. 3:26-cv-01528, on Tuesday, September 22, 2026.

"The purpose of a temporary restraining order is limited to preserving 'an existing situation *in statu[s] quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *Carter v. Sewell*, No. 1:23-cv-01139 (JLR) (RWL), 2023 U.S. Dist. LEXIS 194682, at *1 (S.D.N.Y. Oct. 31, 2023) (*quoting Spencer Trask Software & Info. Servs., LLC v. RPost Int'l, Ltd.*, 190 F. Supp. 2d 577, 580 (S.D.N.Y. 2022)) (emphasis in original). Therefore, although the standard governing TROs is mostly the same as the standard applicable to preliminary injunctions, the "irreparable harm" prong differs. *Carter*, 2023 U.S. Dist. LEXIS 194682, at *1 (*citing Jackson*, 962 F. Supp. at 392). To obtain a TRO, plaintiffs must demonstrate that the irreparable harm "will occur *immediately*." *Id.* (*quoting Omnistone Corp. v. Cuomo*, 485 F. Supp. 2d 365, 367 (E.D.N.Y. 2020)) (emphasis added).

## ARGUMENT

## I. PLAINTIFF CANNOT SHOW A LIKELIHOOD OF SUCCESS

Plaintiff fails to demonstrate that it is likely to succeed on the merits of its Second Amendment claim.

### A. Plaintiff's Facial Challenge is Unlikely to Succeed.

Although Plaintiff asserts in its complaint that it is seeking "an order declaring that the Slimline, V Series, and Gen6 GLOCK pistols do not fall within the definition of a "convertible pistol" pursuant to Conn. Gen. Stat. § 53-202(a)(4) and may continue to be lawfully imported into Connecticut, advertised, sold, and offered or exposed for sale in Connecticut on and after October 1, 2026," (ECF No. 1 at 30, ¶ 1). Plaintiff's motion is a clear facial challenge to PA 26-41.[16]

---

[16] In its motion for TRO, Plaintiff does not specifically request the relief of declaratory judgment at this stage. However, this Court need not stay enforcement if this Court does not ultimately take up interpreting the application of novel state law. 28 U.S.C. § 1367(c)(1). Comity supports declining to determine whether a particular model of firearm falls under a new state law. "Where a decision is to be made on the basis of state law . . . the Supreme Court

Indeed, as the Second Circuit recently noted, "Generally . . . a challenge to a statute before its enforcement will presumptively constitute a facial challenge." *Nat'l Shooting Sports Found., Inc. v. James*, 144 F.4th 98, 107 (2d Cir. 2025) (citation omitted); *see also id.* ("Prospective as-applied challenges are considered 'comparatively infrequently.'") (citation omitted); *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018) ("As-applied challenges are often raised as defenses to individual prosecutions."). That is, in part, because "[c]hallengers bringing preenforcement as-applied challenges cannot rely on hypothetical situations." *Nat'l Shooting Sports Found., Inc.*, 144 F.4th at 107 (citation omitted). That is the situation here.

Moreover, Plaintiff's claim is facial as it alleges PA 26-41 is inconsistent with historical tradition and therefore violates the Second Amendment. ECF No. 1 ¶ 99. While Plaintiff's complaint requests a declaration that its handguns do not fall within the meaning of PA 26-41, that does not turn this action, nor the motion before this court, into an as-applied challenge, as the relief Plaintiff seeks is far broader and its suit seeks to invalidate the entire challenged portions of the Act. *See id.* at 30, ¶ 2 (Plaintiff "requests . . . an order declaring that Public Law 26-14 is unconstitutional on the basis that it is void for vagueness in violation of the due process clause of

---

has long shown a strong preference that the controlling interpretation of the relevant statute be given by state, rather than federal, courts." *Allstate Ins. Co. v. Serio*, 261 F.3d 143, 150 (2d Cir. 2001); *Norton v. Town of Brookhaven*, Docket No. 22-1015-cv, 2023 U.S. App. LEXIS 11912, at *9 (2d Cir. May 16, 2023) (where "unresolved question of state law, comity counsels strongly against the exercise of supplemental jurisdiction."); *Carver v. Nassau County Interim Finance Authority*, 730 F.3d 150, 155 (2d Cir. 2013); ("district court abused its discretion in exercising pendent jurisdiction over interpretation of state statute "that should be resolved by the New York state courts because the manner in which the statute is construed implicates significant state interests."); *Seabrook v. Jacobson*, 153 F.3d 70, 72 (2d Cir. 1998) ("Where a pendent state claim turns on novel or unresolved questions of state law . . . principles of federalism and comity may dictate that these questions be left for decision by the state courts."). Setting aside the facial challenge in this action, whether a particular firearm falls under a particular provision of a state law is best determined by the state courts following state prosecution, where the record can be fully developed. For example, the Supreme Court of Connecticut examined in depth the legislative history and statutory language to determine whether an air gun fell under General Statutes § 53a-3 (6) (definition of "deadly weapon"). *State v. Carter*, 300 Conn. 43, 61 (2024).

the Fourteenth Amendment, violates the right to keep and bear arms protected by the Second and Fourteenth Amendments . . . ."). Thus, Plaintiff "use[s] the term 'as applied' in an idiosyncratic way," as it is not just claiming "that the statute cannot lawfully be applied to their personal facts and circumstances but that the statute cannot be lawfully applied to a broad class of [handguns] that could be [sold] by anyone." *Copeland*, 893 F.3d at 112-13 (2d Cir. 2018) (concluding that a challenge to New York's gravity knife law was a facial challenge).

Because Plaintiff brings a facial challenge here, it has an extremely high hurdle to clear.[17] Indeed, "A facial challenge is the most difficult challenge to mount successfully." *Nat'l Shooting Sports Found., Inc.*, 144 F.4th at 108 (citing cases). To win, Plaintiffs must show that "no set of circumstances exists under which" PA 26-41 "would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

Even if Plaintiff could establish that in some circumstances PA 26-41 violates the Second Amendment, which it cannot, they have not and cannot establish that "no set of circumstances exists under which" PA 26-41 could be upheld. For starters, "[f]acial challenges are disfavored." *Nat'l Shooting Sports Found., Inc.*, 144 F.4th at 107 (citing *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)). That is because "Such challenges 'run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is applied.'" *Id.* (*quoting Dickerson v.*

---

[17] In any event, Plaintiff's challenge is unlikely to be successful for the reasons detailed later in this brief. *See Nat'l Shooting Sports Found., Inc.*, 144 F.4th at 107 ("Classifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding breadth of the remedy, but it does not speak at all to the substantive rule of law necessary to establish a constitutional violation.") (internal quotation marks & citation omitted).

*Napolitano*, 604 F.3d 732, 741 (2d Cir. 2010)). It is also because "claims of facial invalidity often rest on speculation" and "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Dickerson*, 604 F.3d at 741-42 (quoting *Wash. State Grange*, 552 U.S. at 450-51).

Here, Plaintiff fails to carry its heavy burden. Plaintiff's facial challenge rests on the type of speculation that the Second Circuit warned about and seeks to "short circuit the democratic process" by preventing the will of the people— PA 26-41—from being implemented in a manner consistent with the Constitution. For instance, Plaintiff asserts that "the only way for a cruciform-trigger handgun to fall outside [the Act's] definition of 'convertible pistol' is if it 'has a tab or other piece of material molded to the pistol's frame' that cannot 'be readily removed' and 'that shields the cruciform trigger bar from . . . a pistol converter." ECF No. 1 ¶ 46. That is just wrong. Indeed, PA 26-41 provides that "[c]onvertible pistol" means "any semiautomatic pistol with a cruciform trigger bar *that can be readily altered by hand or with a common household tool so that the pistol can be readily converted into a machine gun by the installation or attachment of a pistol converter*." PA 26-41 § 1 (emphasis added). While Plaintiff are correct that a handgun may fall outside the scope of the Act by having the "tab or other piece of material molded to the pistols frame", the act requires a handgun to be *both* a "semiautomatic pistol with a cruciform trigger bar" *and* be "readily convertible."

Because Plaintiff makes no attempt to demonstrate that "no set of circumstances exists under which" PA 26-41 "would be valid," *Salerno*, 481 U.S. at 745, it is unlikely to succeed on its facial challenge.

**B. PA 26-41 Does Not Violate the Second Amendment Because Regulating Readily Convertible Firearms Fits the Historical Tradition of Arms Laws.**

Even assuming, for the purposes of this motion, that PA 26-41 implicates the plain text of the Second Amendment under step one of the *Bruen* analysis, Plaintiff has not shown a likelihood of success on the merits of its Second Amendment claim because PA 26-41 comports with the history and tradition of firearm regulation.

**1. *Bruen*'s historical inquiry supports Public Act 26-41.**

"Like most rights . . . the right secured by the Second Amendment is not unlimited." *United States v. Rahimi*, 144 S. Ct. 1889, 1897 (2024) (internal quotation marks omitted). In *New York State Rifle & Pistol Association v. Bruen*, the Supreme Court established a two-step framework for the evaluation of a Second Amendment claim. 597 U.S. 1 (2022). At step one, the court must assess whether the plaintiff has established by a preponderance of the evidence that the "Second Amendment's plain text covers an individual's conduct." *Id.* at 24. If the Court answers step one affirmatively, "the Constitution presumptively protects that conduct," and the court then proceeds to step two where the burden shifts to the government to demonstrate "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

At step two, the government bears the burden of demonstrating that its regulation "is consistent with the Nation's historical tradition of firearm regulation." *Id*. at 24. This historical inquiry is flexible. In *Rahimi*, the Supreme Court clarified that the government need only demonstrate that "the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." 144 S. Ct. at 1898 (emphasis added). The government need not identify "a dead ringer" or a historical "twin" for the challenged regulation. *Id.* Rather, the modern restriction need only be "'relevantly similar'" to historical restrictions. *See id.* (quoting *Bruen*, 597 U.S. at

29). "Why and how the regulation burdens the right are central to this inquiry." *Id*. A challenged law survives attack if it imposes a "comparable burden on the right of armed self-defense and . . . that burden is comparably justified" when compared to historical analogues. *Bruen*, 597 U.S. at 29.

In assessing the sufficiency of the government's historical showing, the Second Circuit has stressed that historical analogues need not exist "in significant numbers." *Frey v. City of New York*, 157 F.4th 118, 128 (2d Cir. 2025). In some cases, even "a single analogue" may be sufficient. *Wolford v. Lopez*, 146 S. Ct. 2032, 2044 (2026). Since "[l]egislatures past and present have not generally legislated to their constitutional limits," the absence of "positive legislation from a particular time or place" does not necessarily mean that the legislators "deemed such regulation inconsistent with the right to bear arms." *Frey*, 157 F.4th at 128 (quoting *Antonyuk v. James*, 120 F.4th 941, 969 (2d Cir. 2024). "There are many reasons why the historical record may not evidence statutory prohibitions" that are wholly unrelated to the legislators' thoughts about their legality, such as lack of "political demand" or if the restrictions were simply unnecessary. *Antonyuk*, 120 F.4th at 969-70. And requiring a showing that historical analogues "proliferate[d]" is "especially" inappropriate "where there is a lack of constitutional dispute regarding [the historical] regulation" because the absence of such disputes is strong evidence the regulation were believed to be lawful. *Frey*, 157 F.4th at 128; *see also Wolford*, 146 S. Ct. at 2044 ("tacit" acceptance of historical analogues is an "important" factor in evaluating proffered analogues). *Bruen*, for example, held that despite "relatively few" historical examples of firearm prohibitions in sensitive places, the Court could "assume it settled" that such restrictions were lawful because it was "aware of no disputes regarding the lawfulness of such prohibitions." 597 U.S. at 30.

The historical analysis is even more flexible when the modern restriction address "unprecedented societal concerns or dramatic technological changes" that did not exist at the founding. *Bruen*, 597 U.S. at 27. Such cases demand a "more nuanced approach" when comparing the modern restriction to historical ones. *Id.*; *see also Duncan v. Bonta*, 133 F.4th 852, 873 (9th Cir. 2025) (cases implicating unprecedented societal concerns or technological changes "warrant an even more flexible approach then the Court applied in *Rahimi*").

Finally, the historical analysis is not pegged to 1791 when the Second Amendment was adopted. Since Plaintiff is challenging Connecticut state laws, "the prevailing understanding of the right to bear arms in 1868"—when the Fourteenth Amendment incorporated the Second Amendment to the States—"and 1791 are *both* focal points of [the] analysis." *Antonyuk*, 120 F.4th at 972 (emphasis added). And "[t]he time periods in close proximity to 1791 and 1868 are also relevant[.]" *Id.* at 973. Thus, even "[w]here there is no strong historical evidence from the Founding era, it is appropriate to look toward, and rely upon, later historical evidence" from the Reconstruction Era. *Frey*, 157 F.4th at 130.

**2. Public Act 26-41 is consistent with the principles underlying our national history of firearm regulation.**

Applying these principles, PA 26-41 is constitutional. Contrary to Plaintiff's argument, PA 26-41 does not ban handguns, or even handguns with cruciform trigger bars. It prohibits the commercial sale and importation of only particular pistols with cruciform trigger bars that are defectively designed/manufactured such that they can be "readily altered by hand or with a common household tool so that the pistol can be readily converted into a machine gun by the installation or attachment of a pistol converter[.]" PA 26-41 §§ 1(a)(4) and 3(a). To satisfy that standard, the firearm need only have the basic safety feature of "a tab or other piece of material

molded to the pistol's frame that shields the cruciform trigger bar from interference by a pistol converter" and that cannot be "readily removed from the pistol's frame." PA 26-41 § 1(a)(4)(B). This safety feature is an express statutory exception and there could be other designs that make the pistol not "readily convertible." In other words, PA 26-41 is not a ban on an "entire class of arms," it is a common-sense safety regulation that requires all newly manufactured pistols to be equipped with necessary safeguards to prevent easy conversion into automatic weapons in order to be imported and sold commercially in Connecticut.

These types of safety standards on commercial sale of pistols—which respond to modern technological changes and societal concerns regarding the ease by which criminals have exploited design defects to circumvent bans on machineguns—are consistent with history and tradition. Two main categories of historical regulations justify PA 26-41: (1) firearm gunpowder and "proving" laws and practices, in which governments required firearms and gunpowder to pass safety inspections prior to being sold to the public; and (2) laws restricting machineguns and other dangerous weapons.

At the outset, the Court should apply a "nuanced approach" when assessing the history here because PA 26-41 implicates both "unprecedented societal concerns" and "dramatic technological changes" that did not exist during the founding or reconstruction eras. *Bruen*, 597 U.S. at 27; *see Nat'l Assn. Gun Rights v. Lamont*, 153 F.4th 213, 236 (2nd Cir. 2025) (concluding that "nuanced analysis is warranted" where bans on assault weapons and large capacity magazines addressed novel societal problems and technological changes), *cert. granted*, *Grant v. Higgins*, 146 S. Ct. 2811 (2026). PA 26-41 addresses newly developed technology unheard of at the founding or reconstruction. It restricts commercial sellers from knowingly selling pistols that can be easily converted into machineguns. PA 26-41 § 1(a)(4). Machineguns were not developed until the early

1900s. *Nat'l Assn. Gun Rights*, 153 F.4th at 245-46. And PA 26-41 addresses the even-more-modern trend of criminals using 3D printing and other technology to cheaply and easily produce Machinegun Conversion Devices (MCDs) that can effortlessly convert cruciform trigger pistols into machineguns.[18] A pistol equipped with an MCD "can fire up to 1200 rounds per minute—a faster rate of fire than the standard M-4 machinegun" used by the military.[19]

Moreover, PA 26-41 implicates unprecedented societal concerns of the proliferation of affordable machineguns facilitating their use in criminal activity. The "widespread availability of inexpensive" MCDs "are wreaking havoc on American streets" as "[t]he number of shootings involving automatic weapons in the U.S. has skyrocketed in recent years."[20] The Department of Justice has reported "a national escalating trend" of violent criminals "using MCDs and of officials recovering MCDs from individuals and criminal organizations."[21] Between 2017 and 2021, ATF recovered 5,454 MCDs, a 570% increase compared to 2012-2016.[22] That trend has continued since, with the number of recovered MCDs nearly doubling by 2023.[23] Correspondingly, "[i]ncidents of machine gun fire have exploded by about 1,400% from 2019 through [2021]," with sensors in 130 cities detecting roughly 5,600 incidents of automatic weapons fire in 2021.[24] In 2023, there was a 314% increase in violent crime related to MCDs from the prior year.[25]

---

[18] Glover & Devine, *A Device That Can Turn A Semi-Automatic Weapon Into a Machine Gun in Moments Is Wreaking Havoc On American Streets*, CNN (Aug. 30, 2022), *available at* https://www.cnn.com/2022/08/30/us/automatic-machine-gun-fire-invs/index.html (last accessed September 25, 2026).

[19] Press Release, U.S. Attorney's Office, N.D. Tx., Fort Worth Manufacturer Charged in Glock Switch Case (Nov. 18, 2022), *available at* https://perma.cc/B35Z-4AXG (last accessed September 25, 2026).

[20] Glover & Devine, *supra* n.15.

[21] *Garland v. Cargill & Machinegun Conversion Devices*, 72 DOJ J. Fed. L. & Prac. 17, 25 (2024), *available at* https://www.justice.gov/usao/media/1380571/dl (last accessed September 25, 2026).

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.*

The absence of precise historical restrictions explicitly addressing easily-convertible pistols is therefore not persuasive evidence that the founding or reconstruction era generations would have believed PA 26-41's commercial restrictions were unconstitutional. *Nat'l Assn. Gun Rights*, 153 F.4th at 240. Against that backdrop, the historical traditions of imposing safety restrictions on sales through firearm and ammunition "proving" laws, and in restricting unusually dangerous weapons are more than enough to justify the safety standards imposed by PA 26-41.

**3. Public Act 26-41 is consistent with firearm and ammunition "proving" laws.**

There is a broad tradition of requiring firearms and ammunition to comply with safety standards in order to be sold to the public. In 1775 and 1776, Pennsylvania, New Jersey, and New Hampshire, required firearms to meet manufacturing and inspection specifications before they were purchased. Documents & Recordings Relating to the State of New Hampshire During the Period of the American Revolution, 1776-1783 at 15-16[26]; Resolution of the Pennsylvania Committee on Safety, Oct. 27, 1775, Col. Rec. Penn. 10:383[27]; Act for the Inspection of Gunpowder, 1776-1777, N.J. Laws 6, ch.6.[28] *See* Rivas Decl., ECF No. 43-1 at ¶ 5, *United States v. California*, C.D. Ca., 8:26-cv-01697-MRA-ADSx. In 1805, Massachusetts enacted a law "that required an inspection of all firearms manufactured in the state before they could be sold." *Granata v. Campbell*, 798 F. Supp. 3d 46, 61 (D. Mass. 2025) (discussing 1804 Mass. Acts 111 c. 81 § 35),

[26] *Available at* https://scholars.unh.edu/cgi/viewcontent.cgi?article=1007&context=propapers (last accessed September 25, 2026).

[27] *Available at* https://archive.org/details/colonialrecordsov10harr/page/382/mode/2up (last accessed September 25, 2026)

[28] *Available at* https://firearmslaw.duke.edu/laws/1776-1777-n-j-laws-6-an-act-for-the-inspection-of-gunpowder-ch-6-c2a7-1 (last accessed September 25, 2026).

*appeal filed*, No. 25-1918. Maine enacted a similar proving law in 1812. *Id.* (*citing* 1821 Me. L. 546 c. 162).

"The 'proving' process for a firearm entailed testing a weapon by firing it" to "confirm that it would withstand the pressure and wear of use and then stamping the weapon with a 'proof mark' to demonstrate it had passed the test." *Granata*, 798 F. Supp. 3d at 61. This "ensur[ed] that firearms met certain safety standards before being sold and creat[ed] a chain of custody to track how and when they were inspected." *Id.*

States also enacted laws requiring the proving and inspection of gunpowder. *Id.* (*citing* laws from Rhode Island (1776 R.I. Pub. L. 25), New Jersey (1776-77 N.J. L. 6-7 c. 6), New Hampshire (1820 N.H. L. 274 c. 25) and Pennsylvania (1794 P.A. L. 764 c. 337)). Similar to the firearm proving laws, gunpowder proving "dictated requirements pertaining to the quality and composition of the gunpowder and restricted the sale of uninspected or damaged gunpowder." *Id.* at 62.

Applying a nuanced approach, these laws are relevantly similar to Connecticut's commercial restrictions on readily convertible pistols in both "why" and "how" they restrict the sale of firearms. Regarding the "why," the proving laws "ensure[d] that the guns sold to the public were safe and suitable for use" and "prevent[ed] the lives of the [c]itizens [from being] exposed to unsafe firearms." *Granata*, 798 F. Supp. 3d at 61 (internal quotation marks omitted). Connecticut's law similarly protects public safety by imposing safety requirements to ensure that pistols are not sold to the public that may be easily converted into dangerous machineguns and potentially used in violent crime.

As to the "how," the proving laws required appointed provers to test the firearms and mark as unfit any firearm that failed inspection. *Id.* Connecticut's law is no more burdensome on the

right of self-defense. It identifies a minimum safety standard that all pistols with cruciform trigger bars must meet. If anything, Connecticut's sales restriction is less burdensome than the proving laws, which required every firearm and container of gunpowder to pass inspection. By contrast, Connecticut's law only restricts the importation and sale of a specific model of pistols—those with cruciform trigger bars—that lack any mechanism to prevent them from being readily converted into machineguns. And even for those firearms, Connecticut's law does not restrict them from being transferred through private sale, PA 26-41 § 3(b), or prohibit their possession. Moreover, because § 3(a) only criminalizes "knowingly" importing or selling convertible pistols, it does not cover those who are "ignorant of the offending characteristics of their weapons" that render them convertible pistols as defined in § 1(a)(4). *Staples v. United States*, 511 U.S. 600, 620 (1994); *see* Conn. Gen. Stat. § 53a-3(12) ("[a] person acts 'knowingly' with respect to conduct or to a circumstance described by a statute defining an offense when he is aware that his conduct is of such a nature or that such circumstance exists").

**4. Public Act 26-41 is consistent with laws restricting machineguns and other dangerous weapons.**

At the outset, Connecticut's law serves the lawful end of restricting machineguns because it prohibits knowingly importing or selling pistols that "can be readily converted into a machine gun[.]" PA 26-41 § 1(a)(4). "It would be 'startling' to read the Second Amendment as prohibiting a ban on machine guns[.]" *Duncan v. Bonta*, 133 F.4th 852, 882-83 (9th Cir. 2025) (*quoting District of Columbia v. Heller*, 554 U.S. 570, 624 (2008)); *see also Heller*, 554 U.S. at 626 (the Second Amendment does not provide a "right to keep and carry any weapon whatsoever in any manner whatsoever"). And because Connecticut's law was passed in response to evidence of criminals increasingly exploiting the design of convertible pistols to circumvent the ban on machineguns

and using them in violent crime, it fits comfortably within the history and tradition of States "targeting unusually dangerous, novel, or concealable weapons" in response to their use for criminal violence. *Nat'l Assn. Gun Rights,* 153 F.4th at 243; *see also*, *Duncan*, 133 F.4th at 876 n6.

From the 1700s through the 1800s, colonies and States prohibited the concealed carry of some weapons "in response to criminals' secretly carrying those weapons to achieve illicit ends." *Duncan*, 133 F.4th at 875 (citing laws prohibiting concealed carry of picket pistols, skeins, stilladers, daggers or dirks and clubs); *Nat'l Assn. Gun Rights*, 153 F.4th at 244 (similar). And as "new weapons gained popularity and notoriety for their criminal use, legislatures imposed significant restrictions on them." *Duncan*, 133 F.4th at 875. Bowie knives proliferated in the early 1800s and, after they became widely used in fights and duels, many States enacted laws prohibiting them, enhancing criminal penalties for their use, or taxing their sale or ownership. *Id.* at 876; *Nat'l Assn. Gun Rights*, 153 F.4th at 243-44 (collecting laws). Slugshots—hand-held impact weapons with a weighted object at the end of flexible strap—followed a similar trajectory. After their "use by criminals and street gangs became widespread," states widely restricted their use beginning in mid-1800s. *Duncan*, 133 F.4th at 876 (collecting laws). When percussion-cap pistols allowing pistols to remain loaded for longer and contain up to six bullets were used for unlawful purposes with "increasing frequency," several States responded by restricting the carry of concealable pistols. *Id.* (citing state laws from 1871 and 1881). And as weapon technology continued to advance in the early 1900s, the development of the submachine gun in 1918 "and its subsequent use by gangsters in mass shootings" led to the National Firearms Act of 1934, which prohibited ownership of machine guns, submachine guns, and short-barreled shotguns, as well as numerous state analogues. *Nat'l Assn. Gun Rights*, 153 F.4th at 245-46. "A clear pattern emerges" from these

restrictions: "[w]hen criminals took advantage of technological advances in weapons," legislatures acted to restrict those weapons. *Duncan*, 133 F.4th at 876.

Legislators also restricted weapons under circumstances in which the weapon was likely to be misused. As Judge Nagala recently held, there is a history and tradition of disarming under-21-year-olds from acquiring or possessing arms "to protect minors from themselves and society from minors' actions with dangerous weapons due to minors' perceived lack of judgment and maturity." *Succow v. Blanche*, No. 3:25-CV-250 (SVN), 2026 U.S. Dist. LEXIS 163355, at *100 (D. Conn. July 23, 2026). Often-lethal toy pistols proliferated after the Civil War and, after they were exposed as risking accidental injuries and death, especially in children, 15 States adopted sales restrictions on them from 1882 to 1885. Rivas Decl. ¶¶ 27-29 (ECF No. 43-1 in *United States v. California*, C.D. Ca., 8:26-cv-01697-MRA-ADSx). And since the Founding, legislatures have prohibited the setting of trap guns—rigging a firearm when a person unwittingly trips a wire—which "had proved to be an especially dangerous use of firearms[.]" *Duncan*, 133 F.4th at 875 (collecting laws).

These historical laws and PA 26-41 "share the same justification: to protect innocent persons from harm from especially dangerous uses of weapons once the threat to innocent persons has become clear." *Id.* at 879. Historical laws restricting unusually dangerous weapons were enacted in response to the dangers of the time, after those dangers were exposed by instances of misuse or other unlawful behavior. So too with PA 26-41. It restricts the commercial sale of firearms with cruciform trigger bars that the seller knows can be "readily altered by hand or with a common household tool so that [it] can be readily converted" into a machinegun simply by installing a pistol converter. PA 26-41 § 1(a)(4). Pistols with cruciform trigger bars are not new, and neither are MCDs. But "in recent years," the ease by which MCDs can be obtained or

created—such as through 3D printing—has caused "[t]he number of shootings involving automatic weapons" to "skyrocket[]."[29] Connecticut's law responds to these threats by ensuring that commercial sellers are not knowingly selling firearms to citizens in the State that do not contain adequate safeguards to prevent those dangerous uses. Historical restrictions show that "[w]hen criminals took advantage of technological advances in weapons, legislatures acted to restrict an especially dangerous use of those weapons[.]" *Duncan*, 133 F.4th at 876. That is just what Connecticut did.

PA 26-41 also imposes no greater burden on the right of armed self-defense. The historical analogues discussed above often restricted entire classes of weapons, including by banning their sale or possession. PA 26-41 permits the sale of numerous handgun models, including pistols without cruciform trigger bars, or pistols that do have them but are compliant with the law because they are equipped with a "tab or other piece of material molded to the pistol's frame" to block a pistol converter or are otherwise not readily convertible into a machinegun. PA 26-41 § 1(a)(4)(B). Moreover, it only applies to the import or sale of firearms manufactured *after* October 1, 2026.

Taken together, the historical traditions of imposing safety restrictions and standards on the commercial sale of arms and ammunition, and in restricting certain weapons after criminal behavior exposed those weapons to be unusually dangerous, are more than enough to justify PA 26-41. *See Nat'l Assn. Gun Rights*, 153 F.4th at 232 ("*Rahimi* demonstrated that we may look to different historical traditions '[t]aken together' in assessing the constitutionality of challenged statutes") (*quoting Rahimi*, 602 U.S. at 698).

---

[29] Glover & Devine, *supra* n.15.

**5. Plaintiff's Arguments are misplaced because Public Act 26-41 does not categorically ban a class of firearms.**

Plaintiff is wrong that PA 26-41 "categorically ban[s] a certain class of firearms" that law abiding citizens typically possess for lawful purposes. Pl. Br. at 16. Again, PA 26-14 does not ban any firearms, including pistols that have cruciform trigger bars. All it does is require that any such firearm manufactured on or after October 1, 2026, must not be readily convertible, which can be achieved by installing a basic safety feature that prevents the handgun from being readily converted into a machine gun. And even if manufacturers are unable or unwilling to make that adjustment, Connecticut residents may still possess and carry non-complying firearms and purchase them commercially (if they were manufactured before October 1, 2026) or through private transfer (if they were manufactured later).

In any event, even if that narrow restriction could be considered a "ban" on firearms qualifying as convertible pistols, it is plainly not a ban on a "class of firearms" like in *Heller*. Pl. Br. at 16. "[A] law that bans certain handguns with certain features is [not] equivalent for constitutional purposes to a law that bans all handguns as a class." *Capen v. Campbell*, 134 F.4th 660, 674 (1st Cir. 2025). That would "conflate[] *Heller*'s holding that a ban on all handguns is unconstitutional with a more sweeping proposition that any ban whose scope includes any handguns at all is unconstitutional." *Id.*

Nor does Plaintiff's argument that PA 26-41 is unconstitutional because it restricts weapons "in common use" have any merit. Pl. Br. at 17, 22. For starters, Plaintiff has presented no evidence that it would restrict any of its firearms that are in common use. The law does not apply to pistols manufactured prior to October 1, 2026, and Plaintiff represents that the only model it intends to import or sell in Connecticut after that date complies with the law. But in any event, the Second

Circuit has rejected the argument that "the Second Amendment *necessarily* protects *all* weapons in common use," since that would "shield popular weapons from review of their potentially unusually dangerous character." *Nat'l Assn. Gun Rights*, 153 F.4th at 233. Such a standard would "strain both logic and administrability, because it would hinge the right on" "a trivial counting exercise" where even "unusually dangerous arms like the M-16 or the W54 nuclear warhead can gain constitutional protection merely because [they] become[] popular before the government can sufficiently regulate them." *Id.* And Plaintiff is also wrong in suggesting that Connecticut's law is unconstitutional because the Second Circuit used "the Glock 17" as an example of "popular semiautomatic handgun[.]" Pls.' Br. at 17 (*quoting Nat'l Assn. Gun Rights*, 153 F.4th at 242). The court was simply using the Glock 17 as one of several examples (along with the M9 Barretta and other popular hunting rifles manufactured by Ruger) of firearms left unrestricted by the law at issue in that case. That court was surely not suggesting that any restriction that touches in any way on any pistol manufactured by Glock is unconstitutional.

Finally, Plaintiff is wrong that Connecticut's law is anything like a hypothetical law prohibiting rifles or shotguns merely because they can be converted into short-barrel rifles or shotguns. Again, Connecticut's law does not ban cruciform pistols. It merely requires them to contain an adequate safeguard that prevents a converter device from being readily installed or to otherwise not be readily convertible into a machinegun. By contrast, preventing a shotgun from being converted into short-barrel likely could not be accomplished without banning that class of firearms altogether—which may indeed raise constitutional concerns given the substantial burden that would place on Second Amendment rights.

### C. The Plaintiff Is Not Likely to Succeed On Its First Amendment Challenge

In addition to its allegation that PA 26-14 violates the Second Amendment, Plaintiff alleges that the law unconstitutionally infringes upon its "existing and intended speech" related to its "lawful semiautomatic pistols." ECF No. 3-1 at 26. Plaintiff has not met its high bar of establishing that it is likely to succeed on the merits of this challenge and their request for a temporary injunction on this ground should be denied.

Plaintiff repeatedly claims that PA 26-14 broadly restricts any speech related to "lawful pistols." Actual review of the law, however, demonstrates that it is narrowly targeted toward commercial speech advertising certain "convertible pistols" prohibited for sale or import by PA 26-14. The law prohibits the knowing import, advertisement, or sale of particular convertible pistols with a design flaw that makes them uniquely susceptible to conversion into a machinegun, unless such pistols incorporate a safety feature that would interfere with such conversion. The law does not ban pistols generally and does not ban the possession or carrying of even convertible pistols that may be covered by PA 26-14. It also does not ban general speech related to such pistols. Rather, it bars commercial speech designed to advertise for sale that same limited category of convertible pistol barred for import or sale by PA 26-14.

First, Plaintiff's argument improperly presupposes the lawfulness of the convertible pistol advertised. Should the plaintiff prove successful in their Second Amendment challenge to PA 26-14, this separate First Amendment challenge would be rendered moot. Similarly, should, as Defendants argue in this objection, the Plaintiff fail to meet their high burden of establishing the unconstitutionality of PA 26-14 in seeking this preliminary injunction, the plaintiff's First Amendment challenge becomes untenable as the plaintiff would be seeking First Amendment protection for speech related to illegal activity.

The Supreme Court has "recognized the 'commonsense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech." *Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 562 (1980) (internal quotations marks omitted) (*quoting Ohralik v. Ohio State Bar Assn.*, 436 U.S. 447, 455-456 (1978)). "The Constitution therefore accords a lesser protection to commercial speech than to other constitutionally guaranteed expression. . . . The protection available for particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation." *Id.* at 562-63 (citation omitted). Law restricting commercial speech "need only be tailored in a reasonable manner to serve a substantial state interest to survive First Amendment scrutiny." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993) (citing *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)). Notably, the Supreme Court has recognized that the "government may ban . . . commercial speech related to illegal activity." *Hudson*, 447 U.S. at 563-64.

In challenges involving commercial speech, the Court engages in a four-part analysis. The Court first determines whether the expression concerns lawful activity and is not misleading. *Id.* at 566. The Court then evaluates whether the government's interest in regulating the commercial speech is substantial. *Id.* If the answer to both inquiries is affirmative, the Court then evaluates "whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest." *Id.*

Plaintiff's challenge fails at the first of these inquiries. The speech in question—the advertisement for sale of barred semiautomatic pistols readily convertible into machineguns—concerns an *unlawful* activity. PA 26-14 bars the import and sale of *prohibited* convertible pistols. To effectuate such prohibition of import or sale, the law also bars the advertisement for sale that

would relate to such unlawful activity. Because Plaintiff's challenge would fail the first inquiry, the Court's analysis would not need to proceed, and Plaintiff has failed to meet its burden of demonstrating any likelihood of success in his First Amendment claim. And by limiting the law's restriction to advertisements about pistols that the seller *knows* qualify as unlawful convertible pistols, the law ensures that the restriction does not chill sellers from engaging in protected advertisement speech concerning pistols they are concerned, but do not know, may violate PA 26-41. *See Counterman v. Colorado*, 600 U.S. 66, 75, 76-77 (2023) ("a subjective mental-state requirement shielding some true threats from liability" avoids "the hazard of self-censorship by compensate[ing] for the law's uncertainties"); *id.* at 76-77 (discussing other speech contexts where mens rea requirements serve a similar purpose).

Nevertheless, should the Court proceed to evaluate the government's interest in regulating the advertisement for sale of certain prohibited convertible pistols, the State's interest is tied to the same historical interest and analysis presented in the response to the plaintiff's Second Amendment challenge. And here, the State has additional interest in preventing the advertisement for sale of certain convertible pistols that are, themselves, prohibited from sale. Such commercial speech prohibition "directly advances the governmental interest asserted" and "is not more extensive than is necessary to serve that interest." *Id.*

## II. PLAINTIFF CANNOT DEMONSTRATE IRREPARABLE HARM

Plaintiff fails to demonstrate irreparable harm. "For Plaintiff to satisfy the irreparable harm requirement, they must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote or speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Nat'l Ass'n Gun Rights*, 153 F.4th at 248. Plaintiff has not made that showing here.

**A. The Harm Alleged by Plaintiff is Remote and Speculative.**

As an initial matter, Plaintiff asserts irreparable harm in the form of an alleged "deprivation of Second Amendment rights for an indefinite period of time while this Court decides Glock, Inc.'s request for declaratory judgment" (ECF No. 3-1 at 24); however, that is insufficient to establish irreparable harm here for two primary reasons.

First, "an allegation of a constitutional violation is not a magic wand that can be waved to conjure up irreparable harm." *Stallworth v. Joshi*, 2017 U.S. Dist. LEXIS 219931, at *22 (S.D.N.Y. Nov. 22, 2017). Indeed, "the mere allegation of a constitutional infringement itself does not constitute irreparable harm." *New York State Firearms Assn. v. Nigrelli*, 2023 U.S. Dist. LEXIS 222331, at *4-5 (W.D.N.Y. Sep. 21, 2023) (quoting *Lore v. City of Syracuse*, U.S. Dist. LEXIS 26942, 2001 WL 263051, at *6 (N.D.N.Y. Mar. 9, 2001)); *see also Nat'l Ass'n for Gun Rights*, 153 F.4th at 248 (finding that "general assertion" that "a violation of constitutional rights per se constitutes irreparable injury" is "incorrect"). In fact, as even Plaintiffs acknowledge, the Second Circuit has never held that an alleged violation of the Second Amendment constitutes irreparable harm. *See* ECF No. 4-1, p. 26 (*citing Nat'l Ass'n for Gun Rights*, 153 F.4th at 248).

Second, Plaintiff's assertion of an indefinite harm to "Connecticut citizens," (ECF No. 3-1 at 24), is not only unfounded, but it also does not establish that *Plaintiff* will suffer an "actual and imminent" injury. For starters, the statute does not take effect until October 1, 2026, thus any pistols manufactured to date (and before October 1, 2026) are not covered by the statute. Moreover, the statute does not make it unlawful to possess or own such a pistol or to purchase one through private transfer. So Plaintiff's assertion is plainly unsupported. And Plaintiff admits, ". . . the Second Circuit has not yet explicitly held that violations of the right to keep and bear arms

constitute irreparable injury . . . ." ECF No. 3-1 at 25. In any event, as detailed further below, Plaintiff cannot establish an "actual and imminent" injury absent preliminary relief.

**B. The Record Lacks Any Evidence of Alleged Future Loss of Good Will and Loss of Revenue Thus Plaintiff Cannot Establish Imminent Harm.**

Next, Plaintiff asserts "loss of good will and loss of revenue . . . constitutes irreparable harm for purposes of injunctive relief." ECF No. 3-1 at 25. There is nothing in the record to support that Glock will suffer such alleged impact. Plaintiff's sole supporting declaration regards technical specifications of its models, and states nothing about the business impact. At most, Plaintiff makes a theoretical claim regarding its business, which in and of itself cannot suffice. And a closer examination of the authorities relied on by Plaintiff establishes that those cases involved more than theoretical assertions. *Cumulus Media New Holdings Inc. v. Nielsen Co. US, LLC*, 182 F.4th 108, 117 (2d Cir. 2026) (District Court "relied on the Complaint, documents cited in the Complaint, and deposition testimony and declarations submitted by the parties" in enjoining defendants); *Cumulus Media New Holdings, Inc. v. Nielsen Co. (US) LLC*, Docket No. 25-CV-08581 (JAV), 2025 U.S. Dist. LEXIS 269944, at *53 (S.D.N.Y. Dec. 30, 2025) (expert report presented by movant regarding financial consequences); *Reuters, Ltd. v. United Press International, Inc.*, 903 F.2d 904, 908 (2d Cir. 1990) (testimony to establish wire service industry company loss if parties' arrangement to share photographs not extended); *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 67 (2d Cir. 2007) (where trial court relied on testimony regarding escrow liability sales over four days of hearings, not an abuse of discretion to deny injunction); *Grand River Enterprises Six Nations, Ltd. v. Pryor*, 2006 U.S. Dist. LEXIS 35614, at *2 (S.D.N.Y. May 31, 2006) (testifying witnesses included president of entity); *Council for Responsible Nutrition v. James*, 159 F.4th 155, 172 (2d Cir. 2025) ("While the record before us contains little more than

conclusory and speculative predictions of lost sales . . . minimal allegations of lost sales alone do not demonstrate irreparable harm sufficient to warrant preliminary injunctive relief."); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 397 (2d Cir. 2004) (dispute between internet domain registration companies regarding, *inter alia*, alleged trespass by software programs performing multiple automated successive queries). The Plaintiff does not cite any cases establishing that a purely theoretical loss of good will and loss of revenue establishes irreparable harm for purposes of injunctive relief.

### C. Plaintiff's Delay in Seeking Relief from a Bill Passed More Than Four Months Ago Supports Denying the Motion.

"[M]onths-long delays in seeking . . . injunctions have repeatedly been held by courts in the Second Circuit" to be sufficient grounds for denying preliminary relief. *Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432, 439 (E.D.N.Y. 2013) (collecting cases). Indeed, "delays of as little as ten weeks" have been found "sufficient to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary injunction." *Weight Watchers Int'l., Inc. v. Luigino's Inc.*, 423 F.3d 137, 144 (2d Cir. 2005).

Plaintiff's nearly four-month delay from the time the bill became law to filing for relief is more than sufficient to rebut the presumption of irreparable harm and require the TRO to be denied. *See Carter*, 2023 U.S. Dist. LEXIS 194682 at *2 (denying TRO in Second Amendment case due to 8-month delay in filing). And Plaintiff cannot show it will suffer immediate irreparable harm without a TRO. The "'presumption of irreparable harm is inoperative if the plaintiff has delayed' in moving for temporary injunctive relief." *Id.* at *3 (*quoting Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995)). That is true "[e]ven in cases involving alleged

constitutional injuries[.]" *Mintz v. Chiumento*, 724 F. Supp. 3d 40 (N.D.N.Y. 2024) (collecting cases).

Although some courts have held that undue delay is more properly analyzed under the rubric of laches in cases alleging constitutional violations, the lengthy delays here would require the TRO to be denied under that standard as well. *See Mintz*, 724 F. Supp. 3d at 49 (N.D.N.Y. 2024) (denying request for preliminary injunction because plaintiffs "waited 364 days" to file lawsuit challenging law on Second Amendment grounds); *Shady v. Tyson*, 5 F. Supp. 2d 102, 108-109 (E.DN.Y. 1998) (holding that although one-year delay in bringing First Amendment claim did not preclude permanent injunction, it warranted denial of plaintiff's request for a preliminary injunction); *Wallikas v. Harder*, 78 F. Supp. 2d 36, 42-43 (N.D.N.Y. 1999) (ten-month delay in seeking preliminary injunction based on First Amendment claim weighed against finding of irreparable harm); *Perry v. Judd*, 840 F. Supp. 2d 945, 954 (E.D. Va. 2012) (6-month delay barred request for injunctive relief due to laches). Notably, these cases denied motions for preliminary injunction, which requires a less stringent (though still considerable) showing of imminence than TROs do. *Carter*, 2023 U.S. Dist. LEXIS 194682, at *1; *Omnistone Corp.*, 485 F. Supp. 2d at 367.

**D. Laches Bars Plaintiff's Request for the Extraordinary Remedy of a TRO.**

Plaintiff's delay in seeking a TRO also demonstrates that there is no irreparable harm here. And because that delay was both unreasonable and prejudicial to Defendants, laches bars the requested TRO. "Laches is an equitable defense, precluding the claims of a plaintiff who is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." *Republic of Turkey v. Christie's Inc.*, 62 F.4th 64, 71 (2d Cir. 2023) (internal quotation marks omitted). To prevail on a laches defense, "a defendant must establish (1) the plaintiff knew of the defendant's

misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay." *Id.* (internal quotation marks omitted).

Laches "reflects the principle that 'he who comes into equity must come with clean hands.'" *Bray v. City of N.Y.*, 346 F. Supp. 2d 480, 491 (S.D.N.Y. 2004) (quoting *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104 (2d Cir. 2002)). Although laches is often invoked to wholly bar a plaintiff's tardy suit, it can be applied more modestly to bar only particular forms of relief, including, like here, late-breaking requests for preliminary injunctive relief. *Id.* ("Where the non-movant raises a potentially meritorious laches defense, it is appropriate to consider that issue in the preliminary injunction context."); *Ir. Lesbian & Gay Org. v. Giuliani*, 918 F. Supp. 732, 748-49 (S.D.N.Y. 1996) (denying preliminary injunction, noting plaintiff "is guilty of laches"); *New Era Publ'ns Int'l, ApS v. Henry Holt & Co.*, 684 F. Supp. 808, 809 (S.D.N.Y. 1988) ("I conclude that plaintiff is chargeable with laches and that the temporary restraining order should not be granted for that reason."). "Even in cases involving alleged constitutional injuries," courts have found that prejudicial delays "warrant denying preliminary injunctive relief" based on laches. *Mintz v. Chiumento*, 724 F. Supp. 3d at 50 (collecting cases).

The equitable nature of laches necessarily requires that the resolution be based on the circumstances peculiar to each case." *Tri-Star Pictures v. Leisure Time Prods., B.V.*, 17 F.3d 38, 44 (2d Cir. 1994). And "[t]he determination of whether laches bars a plaintiff from equitable relief is entirely within the discretion of the trial court." *Id.* Plaintiff's delay has severely prejudiced Defendants' ability to assemble the evidence necessary to defend its expedited request for relief, including assembling the substantial historical record required to defend the fact-intensive *Bruen* claim, by providing mere days to do so.

**1. Plaintiff's delay is unreasonable.**

PA 26-41 became law on May 26, 2026.[30] Yet Plaintiff offers no reasonable explanation in its Emergency Motion to excuse its four-month delay in seeking relief to enjoin Defendants from enforcing it, even though it is this very delay that created the emergency Plaintiff rely on.

First, Glock did not contact a state official with any connection to enforcement—including any of the Defendants here—until 13 days before it filed for a TRO. *See* Conn. Gen. Stat. § 51-276 (the "Division of Criminal Justice . . . shall be in charge of the investigation and prosecution of all criminal matters in Superior Court"). Plaintiff allegedly waited more than a month after the law was passed before contacting representatives of the Connecticut Office of the Attorney General ("OAG") on July 3, 2026, to discuss Section 53-202 and whether it applied to Glock's Slimline, V Series, and Gen6 pistols. Compl. ¶¶ 53-54 (meeting on August 27, 2026). According to Plaintiff, OAG representatives told Glock that OAG does not have criminal law enforcement authority, cannot answer legal questions from private parties, and that Glock should bring its questions to a state official with criminal enforcement authority: the Chief State's Attorney. *Id.* ¶ 56. It then waited until September 8, 2026, to send a letter to the Defendant State's Attorneys and requested a response by September 14, 2026. *Id.* ¶ 57. It then waited for this response for 13 days before it finally sought relief from this Court on September 21, 2026. This sequence of events does not excuse Glock's delay in seeking relief.

Glock did contact OAG. But OAG has no authority over "legal matters over which prosecuting officers have direction" and cannot provide legal advice to private parties because the Attorney General may only advise state officials and agencies, facts which Glock could have easily

---

[30] Public Act No. 26-41, *available at* https://www.cga.ct.gov/2026/ACT/PA/PDF/2026PA-00041-R00HB-05043-PA.PDF (last accessed September 25, 2026).

verified in the months before it sought emergency relief. Conn. Gen. Stat. § 3-125. And even when Glock contacted OAG, it did so only to discuss its concerns about how the act applies to Glock's Slimline, V Series, and Gen6 GLOCK pistols. Complaint ¶¶ 53, 54, 56, 57 (alleging only that it discussed these specific pistols with OAG and afterwards "requested the State's position regarding whether the Slimline, V Series, and Gen6 GLOCK pistols are considered to be 'convertible pistols'"). Glock did nothing in the months between enactment and that law's effective date to address any broader concern about how PA 26-41 applies to all cruciform trigger bar pistols. Yet now it seeks emergency relief on a facial challenge to how that law applies to all cruciform trigger bar pistols. Complaint ¶¶ 95-115. Instead of taking reasonable actions to forestall the need for this relief after identifying its concerns, such as contacting the officials that enforce criminal law in Connecticut, Plaintiff unreasonably waited almost two months to meet with the wrong officials even after identifying a specific concern with the law, and it did nothing to address its broader concern about how the law applies to all cruciform trigger bar pistols.

Second, Glock alleged in its Complaint facts suggesting PA 26-41 presented a threat to its business in Connecticut. Compl. ¶ 2. In assessing delay for laches, "the focus is on the reasonableness of the delay rather than on the number of years that have elapsed." *Armstrong v. Virgin Records, Ltd.*, 91 F. Supp. 2d 628, 644 (S.D.N.Y. 2000) ) (internal quotation marks omitted). "Where, as here, plaintiffs delay in seeking court intervention, their unexcused delay speaks strongly against granting a preliminary injunction." *H2O v. Town Bd. of the Town of E. Hampton*, No. CV 15-cv-2349, 2015 U.S. Dist. LEXIS 160413, at &47-48 (E.D.N.Y. Oct. 15, 2015) (Shields, M.J.) ; *see also Nat'l Council of Arab Ams. v. City of N.Y.*, 331 F. Supp. 2d 258, 265-66 (S.D.N.Y. 2004) (laches applied to request for preliminary injunction made one and one half months after final ruling, and fifteen days before action sought to be enjoined was to take place); *Ir. Lesbian &*

*Gay Org.*, 918 F. Supp. at 748-49 (plaintiff "guilty of laches for failing to bring the lawsuit earlier when the position of the parties could be thoroughly presented" when it "wait[ed] until nineteen days before the parade to initiate this action for injunctive relief"). Glock simply did not take the actions a reasonable business entity facing the level of disruption it claims.

**2. Plaintiff's unreasonable delay has severely prejudiced Defendants.**

Further, Plaintiff's unreasonable delay has severely prejudiced Defendants' ability to defend PA 26-41. This kind of prejudice is exactly the kind of prejudice with which the laches doctrine is concerned. *H2O*, 2015 U.S. Dist. LEXIS 160413, at *48 ("prejudice to defendants . . . in the ability to prepare their case" supported "application of laches" to deny preliminary injunction); *Ir. Lesbian & Gay Org.*, 918 F. Supp. at 749 (laches applied where "delay has prejudiced both [defendants] in the preparation and presentation of their respective cases"); *Nat'l Council of Arab Ams.*, 331 F. Supp. 2d at 266 (same).

Here, unnecessarily rushing Defendants to brief this expedited request and participate in an evidentiary hearing is especially harmful given the novelty and complexity of the legal issues raised by Plaintiff's constitutional claims. *See Mintz*, 724 F. Supp. 3d at 50 (noting particular harm in compelling state defendants "to prepare for and contest litigation involving significant historical and constitutional issues in a short period of time"). In particular, Plaintiff argues that PA 26-41 fails the two-step *Bruen* framework. *E.g.*, ECF No. 3-1 at 13-20.

Yet, "[T]he historical analysis required by *Bruen*" is "difficult"; even when done well, on a typical briefing schedule, it often "yield[s] some measure of indeterminacy." *Atkinson v. Garland*, 70 F.4th 1018, 1024 (7th Cir. 2023). *Bruen* historical analysis requires the parties to engage deeply with many historical records. *See id.* at 1022-24 (noting that Supreme Court in *Bruen* "rolled up its sleeves and examined a wealth of laws and commentary spanning several

centuries, paying close attention to the enforcement and impact of various regulations" and proposing "[s]everal interrelated and non-exhaustive questions [that] may help focus the proper analysis on remand"). That kind of analysis takes more than the timeframe available here because of Plaintiffs' unreasonable delay. *See Def. Distributed v. Bonta*, No. CV 22-6200-GW-AGRx, 2022 U.S. Dist. LEXIS 195839, at *12 n.9 (C.D. Cal. Oct. 21, 2022) ("there is no possibility this Court would expect Defendants to be able to present the type of historical analysis conducted in *Bruen* on 31 days' notice (or even 54 days' notice)," so "obtaining a preliminary injunction . . . was wishful-thinking, at-best, for at least that reason."); *Colon v. BATFE*, No. 8:23-cv-223-MSS-UAM, 2024 U.S. Dist. LEXIS 13966, at *55 (M.D. Fla. Jan. 26, 2024) ("*Bruen* makes clear that Defendants' choice of analog need not be an historic twin, even so, finding a close archival comparator is no small feat, especially in the infancy of litigation").

Indeed, a major concern of laches is ensuring that a plaintiff's delay does not prejudice a defendant in its ability to gather evidence. The "law of laches" is often applied when the "lapse of time" has "carrie[d] with it the memory and life of witnesses, the muniments of evidence, and other means of proof." *Costello v. United States*, 365 U.S. 265, 282 (1961) (internal quotation marks omitted); *Robins Island Pres. Fund, Inc. v. Southold Dev. Corp.*, 959 F.2d 409, 424 (2d Cir. 1992) (laches barred action in part because it was "impossible for [defendant] to obtain witnesses or marshal evidence to support its contentions" given passage of time). Plaintiff's delay implicates this same concern and inflicts a similar prejudice on Defendants here, in that it effectively denies them the ability to fully assemble and assess the historical evidence necessary to defend against Plaintiff's *Bruen* claim.

Consequently, the balance of the equities overwhelmingly favors applying laches here and denying relief. There is no emergency warranting this extraordinary remedy other than one of Plaintiff's own making, and an injunction would offend equity and disserve the public interest.

## III. PUBLIC INTEREST AND BALANCE OF THE EQUITIES WEIGH AGAINST AN INJUNCTION

As a matter of policy, the people of Connecticut, through their legislators, have decided not to wait any longer to require manufacturers to prevent handguns that can "by hand or with a common household tool . . . be readily converted into a machine gun by the installation or attachment of a pistol converter," address this public safety concern with safeguards such as "a tab or other piece of material molded to the pistol's frame that shields the cruciform trigger bar from interference by a pistol converter, unless the tab or other piece of material can be readily removed from the pistol's frame." PA 26-41 § 1(4)(B). The public interest in preventing the conversion of semiautomatic handguns into fully automatic machineguns is more than warranted.

As a general principle, the regulation of firearms is one of Connecticut's most critical and effective tools in protecting public health. This is especially so for the health of Connecticut's children. According to a John Hopkins study analyzing gun deaths in Connecticut, firearms were the fifth leading cause of death among children and teens ages 1-17 from 2018 to 2022.[31] And gun violence disproportionately affects young men in Connecticut. *Id.* ("Young Black males ages 15-34 make up 2% of the state's population but accounted for 29% of all gun homicide deaths in

---

[31] *See* John Hopkins Bloomberg School of Public Health, Center for Gun Violence Solutions, *available at* https://publichealth.jhu.edu/sites/default/files/2024-10/v3-01.035-CGVS-State-Factsheets-CT.pdf. (last viewed September 24, 2026).

2022."). The impact of even one additional gun injury or gun death in Connecticut is devastating and can cost into the millions per individual injury or a survivor family.[32]

It is clear, however, that convertible semiautomatic pistols represent an even graver safety concern warranting regulation. According to the ATF, "MCDs pose an extraordinary threat to public safety."[33] Semiautomatic pistols that have been converted can fire up to 1,200 rounds per minute continuously until the pistol runs out of ammunition.[34] The continuous recoil caused by automatic fire in these modified pistols makes it extremely difficult to fire them with accuracy. Indeed, "the rapid recoil on such modified weapons makes them almost uncontrollable for adults and teenagers with no training."[35] For example, as one police chief noted: "there is no other reason to have guns with fully automatic conversion devices, other than to cause mass destruction quickly amongst large groups of people."[36] And the threat to police is substantial: "Most officers' guns carry either 11 or 16 rounds. That's most officers. And we're seeing more and more that . . . people are able to get off 50 to 100 shots in under a minute [with these modified weapons.]"[37]

Although the Plaintiff alleges that thrust of prior statutes have been to criminalize the possession of an illegally modified pistol, rather than the import, advertisement or sale of underlying readily convertible pistol, *see* Pls.' Br. at 19, as a matter of policy such focus no longer

---

[32] *See* Everytown for Gun Safety, "*Economic Cost of Gun Violence | Everytown Research & Policy" available at* https://everytownresearch.org/report/the-economic-cost-of-gun-violence/ (last viewed September 24, 2026).

[33] "Machinegun Conversion Devices" Fact Sheet, Bureau of Alcohol, Tobacco, Firearms and Explosives, *available at* https://www.justice.gov/usao-wdok/media/1366621/dl (*last accessed* September 27, 2026).

[34] Press Release, U.S. Attorney's Office, N.D. Tx., Fort Worth Manufacturer Charged in Glock Switch Case (Nov. 18, 2022), *available at* https://perma.cc/B35Z-4AXG (last accessed September 25, 2026).

[35] "Machine-gun conversion device dubbed 'Glock switches' taking violence to the 'next level': Experts," ABC News, *available at* https://abcnews.com/US/machine-gun-conversion-device-taking-violence-level-experts/story?id=110855649 (last accessed September 27, 2026).

[36] "Machine-gun conversion device dubbed 'Glock switches' taking violence to the 'next level': Experts," ABC News, *available at* https://abcnews.com/US/machine-gun-conversion-device-taking-violence-level-experts/story?id=110855649 (last accessed September 27, 2026).

[37] *Id.*

suffices because while previously, switches were often imported from overseas, 3D printing has enabled individuals to produce switches locally, making them much more widely available. Indeed, as recently as September 3, 2026, an individual was indicted for selling more than 50 switches created with a 3D printer.[38]

And as to the balance of the equities, in addition to the other reasons previously detailed, the Plaintiff's delay in seeking relief, as argued above, weighs against the issuance of a TRO.

Lastly, it is well established that constitutional challenges should be addressed as narrowly as possible, and that offending portions of laws should be severed rather than invalidating the law as a whole. *National Assn. Gun Rights*, 153 F.4th at 229 n.16 (*citing Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 507 (1985) (holding that "the Court of Appeals should have pursued . . . partial invalidation"); *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984) (explaining that when a law "contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and maintain the act in so far as it is valid")). Defendants submit that should a stay issue, so that a fuller and more thorough record and briefing may be accomplished.

**CONCLUSION**

The Court should deny the motion.

* * *

[38] "19-year-old charged with selling more than 50 'Glock switches' he created with a 3D printer, court records show," News4JAX, Sept. 15, 2026, *available at* https://www.news4jax.com/news/local/2026/09/15/19-year-old-charged-with-selling-more-than-50-glock-switches-he-created-with-a-3-d-printer-court-records-show/ (last accessed September 27, 2026); *see USA v. Justavino*, MD Florida, Docket No. 3:26-cr-00214-WWB-LLL.

Dated: Hartford, Connecticut
September 28, 2026

Respectfully Submitted,

DEFENDANTS,

WILLIAM TONG
ATTORNEY GENERAL

By: /s/

Edward D. Rowley (ct30701)
Jacob L. McChesney (ct30282)
August L. Pozgay (ct31901)
Assistant Attorneys General
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
Jacob.McChesney@ct.gov
August.Pozgay@ct.gov
Edward.Rowley@ct.gov
Tel.: (860) 808-5450
Fax: (860) 808-5591

**CERTIFICATION**

I hereby certify that on September 28, 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ August L. Pozgay
August L. Pozgay
Assistant Attorney General